IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF OKLAHOMA

SCOTT JAMES EIZEMBER,      )
                  )
       Petitioner,      )
                  )
vs.                )     Case No. CIV-08-377-C
                  )
ANITA TRAMMELL, Warden,     )
   Oklahoma State Penitentiary,   )
                  )
       Respondent.     )

## MEMORANDUM OPINION

Petitioner, Scott Dean Eizember, a state court prisoner represented by appointed counsel, has filed a Petition for a Writ of Habeas Corpus seeking relief pursuant to 28 U.S.C. § 2254. (Dkt. No. 24.) Petitioner is challenging the Judgment and Sentence entered against him in Canadian County District Court Case No. CF-2005-35,[1] wherein he was tried by jury in February 2005 and found guilty of Murder in the Second Degree By Felony Murder (Count 1 - Patsy Cantrell); Murder in the First Degree (Count 2 - A.J. Cantrell); Assault and Battery With a Dangerous Weapon (Count 3 - Carla Wright); Shooting With Intent to Kill (Count 4 - Tyler Montgomery); Burglary in the First Degree (Count 5 - Wright home); and Burglary in the Second Degree (Count 6 - Cantrell home). For his non-capital crimes, Petitioner received a consecutive sentence of life imprisonment plus 180 years and fines totaling $30,000. On Count 2, the murder of Mr. Cantrell, the jury found two aggravating

_____

[1] Petitioner's crimes occurred in Creek County, but due to a change in venue, Petitioner was tried in Canadian County.

circumstances (great risk of death to more than one person and especially heinous, atrocious, or cruel), and Petitioner was sentenced to death (O.R. VI, 978-983, 1059; O.R. VII, 1213-18; Tr. IX, 1741-42; Tr. XII, 2230; S.Tr. 4-5).[2]

Petitioner has presented thirteen grounds for relief. (Dkt. No. 24.) Respondent has responded to the Petition and Petitioner has replied. (Dkt. Nos. 33 and 39.) In addition to his Petition, Petitioner also filed a motion for an evidentiary hearing, to which a response and reply have also been filed. (Dkt. Nos. 34, 35, and 39.) The state court record has been provided. After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that, for the reasons set forth below, Petitioner is not entitled to his requested relief.

## I. Procedural History.

In Case No. D-2005-319, Petitioner appealed his convictions and sentences to the Oklahoma Court of Criminal Appeals ("OCCA"). In a published opinion, Eizember v. State, 2007 OK CR 29, 164 P.3d 208, the OCCA affirmed. Petitioner sought review of the OCCA's decision by the United States Supreme Court. His petition for writ of certiorari was denied on March 17, 2008. Eizember v. Oklahoma, 552 U.S. 1269 (2008). Petitioner also sought post-conviction relief from the OCCA. The OCCA denied relief in an unpublished

---

[2] For his non-capital crimes, Petitioner was sentenced as follows: Count 1, 150 years; Count 3, 10 years and a $10,000 fine; Count 4, life imprisonment and a $10,000 fine; and Count 5, 20 years and a $10,000 fine. Finding that Count 6 merged into Count 1, the trial court dismissed Count 6 at sentencing.

opinion. <u>Eizember v. State</u>, No. PCD-2005-371 (Okla. Crim. App. Aug. 20, 2007) (unpublished).

## II. Summary of the Facts.

Riding into town on a bicycle, Petitioner came from Detroit, Michigan, to the small community of Depew, Oklahoma, in late September 2002. The first Depew citizen Petitioner met was retired school teacher John Wright. It was a Saturday and Mr. Wright was mowing the lawn of the Methodist Church in preparation for services the following day. As a member of a community where doors were left unlocked and car keys were left in the ignition, Mr. Wright extended the hand of hospitality to Petitioner. Petitioner spent that night in the church's fellowship hall and the next day he attended the worship service. Through Mr. Wright, Petitioner was introduced into the community and of particular importance, to Mr. Wright's then-married daughter, Kathy Biggs. Petitioner became romantically involved with Ms. Biggs and sometime after her divorce, Ms. Biggs moved to Tulsa where she shared an apartment with Petitioner. With time, however, the romance faded and by August 2003 Ms. Biggs had moved back to Depew and obtained a protective order against Petitioner.

In October 2003, and after a stint in the Tulsa County Jail for violation of the protective order, Petitioner returned to Depew to see Ms. Biggs. However, rather than go to the Wrights' home where Ms. Biggs was staying, Petitioner opted to wait for her in the house directly across the street. So began Petitioner's crime spree on October 18, 2003, a crime spree which, as is relevant to this case, resulted in the deaths of both Mr. and Mrs. Cantrell,

the Wrights' across-the-street neighbors; two gunshot wounds to Ms. Biggs' 16-year-old son, Tyler; and the beating of Ms. Biggs' mother, Mrs. Wright.

After committing his crimes, Petitioner evaded capture for over a month. For several days, he hid in the rural wooded area surrounding Depew. After that, he took up residence in a storage building at the Depew Methodist Church. When Petitioner was discovered in the storage building by an elderly church volunteer on November 23, 2003, he used her car to leave Depew. However, later that same day, Petitioner, suffering from gunshot wounds inflicted by yet another victim of his continued crime spree, was apprehended by authorities at a hospital in Lukfin, Texas. Once in custody, Petitioner confessed his crimes on two separate occasions.[3]

### III. Standard of Review.

### A. Exhaustion as a Preliminary Consideration.

The exhaustion doctrine is a matter of comity. It provides that before a federal court can seek to grant habeas relief to a state prisoner, it must first determine that he has exhausted all of his state court remedies. As acknowledged in Coleman v. Thompson, 501 U.S. 722, 731 (1991), "in a federal system, the States should have the first opportunity to address and correct alleged violations of state prisoner's federal rights." While the exhaustion doctrine has long been a part of habeas jurisprudence, it is now codified in 28

---

[3] In adjudicating Petitioner's direct appeal, the OCCA presented an extensive and detailed summary of the evidence, which need not be reproduced here. Eizember, 2007 OK CR 29, ¶¶ 2-32, 164 P.3d at 214-20. Additional facts will be referenced herein as they relate to the individual grounds for relief raised by Petitioner.

U.S.C. § 2254(b). Pursuant to 28 U.S.C. § 2254(b)(2), "[a]n application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State."

**B.    Procedural Bar.**

Beyond the issue of exhaustion, a federal habeas court must also examine the state court's resolution of the presented claim. "It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" Cone v. Bell, 556 U.S. 449, 465 (2009) (quoting Coleman, 501 U.S. at 729). "The doctrine applies to bar federal habeas when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." Coleman, 501 U.S. at 729-30.

**C.    Merits.**

In accordance with the Antiterrorism and Effective Death Penalty Act of 1996 (hereinafter "AEDPA"), the Court's ability to grant habeas corpus relief to state prisoners is limited. When a state prisoner presents a claim to this Court, the merits of which have been addressed in state court proceedings, the Court cannot grant habeas corpus relief upon the claim unless it determines that the state court proceedings resulted in a decision (1) "that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

The focus of Section 2254(d) is on the reasonableness of the state court's decision. To obtain relief, a petitioner must show that the state court decision is "objectively unreasonable."  Williams v. Taylor, 529 U.S. 362, 409 (2000) (O'Connor, J., concurring but delivering the opinion of the Court with respect to Part II).  See Cullen v. Pinholster, 563 U.S. ___, 131 S.Ct. 1388, 1398 (2011) (acknowledging that Section 2254(d) places a difficult burden of proof on the petitioner).  "The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold."  Schriro v. Landrigan, 550 U.S. 465, 473 (2007).

"Under § 2254(d), a habeas court must determine what arguments or theories supported . . . the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of [the Supreme] Court."  Harrington v. Richter, 562 U.S. ___, 131 S.Ct. 770, 786 (2011).  Relief is warranted only "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [the Supreme] Court's precedents."  Id. The deference embodied in Section 2254(d) "reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal."  Id. (citation omitted).

# IV. Analysis.

## A.  Grounds I and II:  Trial  Court's  Denial of Petitioner's For-Cause Challenges to Jurors D.B., J.S., and A.S.

In Grounds I and II, Petitioner asserts he was denied his constitutional right to an impartial jury due to the trial court's failure to grant his request to excuse for cause three members of the second death qualification panel who had pro-death penalty leanings.  Two of the members, D.B. and J.S., served on the jury.  The other, A.S., did not sit on the jury but was removed by Petitioner through the exercise of one of his nine peremptory challenges. Respondent asserts that Petitioner is not entitled to relief on either ground because he has failed to show that the OCCA's denial of relief is contrary to or an unreasonable application of Supreme Court law.

**Juror D.B.**  Prior to voir dire, prospective jurors were asked to complete a questionnaire.[4]  On the questionnaire, D.B. indicated that she was in favor of the death penalty.  In explanation of her opinion, D.B. wrote, "I firmly believe if you take a life you should lose yours."  When asked about her feelings about the death penalty, D.B. wrote, "I have no reservations about seeing some one put to death so long as it has been proven the person is guilty, especially if they have taken the lives of others."  When asked about the purpose the death penalty serves in society, D.B. wrote, "Keeps taxpayers from having to support a criminal for the remainder of their life."  Regarding the imposition of the death

---

[4] The sealed questionnaires are a part of the direct appeal original record (O.R. IV, 752A-752D; O.R. VII, 1249-50).

penalty in Oklahoma, D.B. wrote that it was "definitely not [used] too often." When asked to choose the statement that best stated her view about capital punishment, D.B. chose "I am strongly in favor of capital punishment as an appropriate penalty." However, when asked to choose the statement that best stated her position on imposing a sentence of life, death, or some other penalty, D.B. chose "I would consider all of the penalties provided by law and the facts and circumstances of the particular case."

On the questionnaire, D.B. indicated that she did not want to serve as a juror because of the anticipated length of the trial and the media attention. She revealed that she had learned about the case through the media, and although she had not yet formed any opinion about the case, she did not believe that she could be fair and impartial. She wrote, "Again, all you hear through the media is the bad side of the case. I cannot understand why someone would kill another - for no reason." Finally, on the last question, D.B. stated that if she were a party to the case, she would not want herself as a juror. Her stated reason was "[b]ecause if I feel guilt has been proven, I would not hesitate to impose the death penalty."

D.B. was one of twenty-four on the second death qualification panel (O.R. IV, 769). During the trial court's questioning of the panel, panel members were asked about their ability to fairly consider all three punishments in the event Petitioner was found guilty of first degree murder. Three jurors (two who stated they could never impose a death sentence and one who stated he would only impose death) spoke out, and after further questioning by counsel, they were all excused for cause. Despite her questionnaire answers about the death

penalty (and her desire not to serve as a juror), D.B. did not speak up, but instead indicated by her silence that she could consider all three punishments (Tr. I, 173-84).

In response to questioning from the prosecutor, D.B. stated, without any reservation or noted hesitation, that she could consider all three punishments (Tr. I, 207-08). When asked again after being informed of the alleged aggravating circumstances, D.B. stated again that she could consider all three punishments (Tr. I, 233). In response to the last question posed from the prosecutor, D.B. additionally stated that she would not enter deliberations with a preconceived outcome, but would use the instructions to reach her decision (Tr. II, 236-37).

In response to questioning from defense counsel, D.B. stated that she would not presume or infer guilt as a result of spending so much time in voir dire questioning the panel about available punishment options (Tr. II, 240). Although D.B. stated that she could consider a life sentence, she expressed difficulty with the life without parole option. She stated that she could only consider life without parole if the death penalty was not an option. She explained herself as follows: "If they're in prison for the remainder of their life without the possibility of parole why not the death penalty?" (Tr. II, 249). When asked by defense counsel whether that meant that she would automatically consider the death penalty over the other two options, D.B. answered, "Probably" and then, "I would have to look at all three but just off the cuff, it would probably be death" (Tr. II, 249-50). D.B. further explained that she could give meaningful consideration to life, but that she would "have to try hard" to give meaningful consideration to life without parole. When asked then if she would want herself

as a juror if she were on trial, D.B. answered affirmatively and then explained, "I would not want to spend my life in prison without the possibility of parole" (Tr. II, 250-51). If the death penalty was not an option, D.B. stated that she could consider both life and life without parole (Tr. II, 264).

At the conclusion of questioning of the second panel, defense counsel asked that D.B. be removed for cause. Defense counsel argued, "[D.B.] said in her questionnaire that she firmly believes that if you take a life you should lose yours. Again, that contrasted to the answers she gave during our Voir Dire examination in the, the courtroom . . ." (Tr. II, 276).[5] The trial court overruled the challenge (Tr. II, 279).

Per agreement of the parties, after death qualification of the three panels, thirty death qualified members were assembled in their original panel order for cause examination. Peremptory challenges could only be used on those members seated in the first twelve seats (in the jury box). When a peremptory was exercised, the removed panel member was replaced in order by members seated in seats eighteen through thirty (M.Tr. 1/13/05, 21-25; Tr. II, 394-95). D.B., who was originally seated in seat twenty-eight, came into the jury box when defense counsel exercised his eighth peremptory challenge to remove Juror A.S. (O.R. IV, 771; Tr. III, 516-17). Although the ninth peremptory challenge could have been used to remove D.B., defense counsel used his final peremptory on another panel member, one never challenged for cause (Tr. III, 517-18). After exercising all of his peremptory challenges,

_____

[5] Habeas counsel alleges that defense counsel partially misstated the case because D.B.'s voir dire answers were similar to her questionnaire answers. (Pet. at 27 n.13.)

defense counsel then requested two additional peremptory challenges, one of which he would have used to remove D.B. (Tr. III, 518-19).

On direct appeal, Petitioner challenged the trial court's failure to remove D.B. for cause. Because defense counsel failed to use his ninth peremptory challenge to remove D.B., the OCCA found that the claim had not been properly preserved. Reviewing for plain error, the OCCA denied relief. Considering the totality of D.B.'s responses, the OCCA found that they did "not demonstrate an impossible bias towards the death penalty." Eizember, 2007 OK CR 29, ¶ 56, 164 P.3d at 225. In addition, the OCCA found as follows:

> Individual responses read in isolation may suggest such a bias as [Petitioner] claims. However, other responses indicate Juror D.B. could be a fair and impartial juror. This situation points out the importance of the oral *voir dire*. Although the juror questionnaire mentioned there were three possible punishments for a conviction for intentional murder, no options other than the death penalty were addressed. The questionnaire did not explain the law regarding proof of aggravators or weighing of the mitigating evidence against the aggravators. Despite these omissions, D.B. indicated she could consider all punishment options. It was not until *voir dire*, and specifically questioning by defense counsel, that the juror's views on the other punishment options were explored. D.B. did not say she would automatically consider the death sentence. Her response that "off the cuff" she would consider death as punishment for intentional murder does not indicate a predisposition toward the death penalty, but rather illustrates a "gut reaction." We are confident that any determination made during jury deliberations would be an informed decision and not merely "off the cuff."

Id. While acknowledging that D.B. may have expressed difficulty considering all three options equally, the OCCA noted record support for the trial court's conclusion that D.B. could nevertheless give consideration to all three punishments. Id. at ¶ 57, 164 P.3d at 225-

26.   Moreover, to the extent a question existed as to her ability to be a fair and impartial juror, the OCCA deferred to the trial court's resolution of the matter.

> Having the benefit of observing D.B.'s demeanor throughout *voir dire*, the court found her responses credible and insufficient to excuse her for cause. Our review of the totality of her *voir dire*, written and oral responses, supports the trial court's finding that D.B. did not have such a strong bias towards the death penalty that the performance of her duties as juror would be prevented or substantially impaired.   Accordingly, the trial court did not abuse its discretion in refusing to remove her for cause.

Id. at ¶ 57, 164 P.3d at 226.

**Juror J.S.**   On the questionnaire, J.S. indicated that he was in favor of the death penalty.   In explanation of his opinion, he stated that the death penalty is appropriate if the crime fits.   He then indicated that it is appropriate for heinous crimes and child murderers. When asked about his feelings about the death penalty, J.S. stated that he is "Pro-Death," but he qualified that answer with "[d]epending on the crime committed."   When asked about the purpose the death penalty serves in society, J.S. wrote, "Takes repeat offenders out of civilized society."   Regarding the imposition of the death penalty in Oklahoma and whether he felt it was used too often or too seldom, J.S. responded, "About right."   When asked to choose the statement that best stated his view about capital punishment, J.S. chose "I am in favor of capital punishment, except in a few cases where it may not be appropriate." However, when asked to choose the statement that best stated his position on imposing a sentence of life, death, or some other penalty, J.S. chose "I would consider all of the penalties provided by law and the facts and circumstances of the particular case."

On the questionnaire, J.S. indicated that he wanted to be a juror on the case "[s]o justice can be served." However, in response to two other questions, he advised that an upcoming, previously scheduled rotator cuff surgery might prevent him from serving as a juror on this case. Although J.S. indicated that he had learned about the case through the media, he stated that he could nevertheless be fair and impartial based on his belief that "[s]entencing should be appropriate." J.S. further stated that he had not made up his mind about the case and that "[e]very person deserves their day in court." Finally, on the final question, J.S. stated that if he were a party to the case, he would not want himself as a juror because "[i]f guilty, he will be on death row and eventually executed."

Like D.B., J.S. was also on the second death qualification panel (O.R. IV, 769). Also like D.B., J.S. remained silent during the trial court's questioning about each panel member's ability to consider all three punishments (Tr. I, 173-84). In response to questioning by the prosecutor, J.S. stated that he did not have any qualms about imposing a death sentence, but that he could also consider both life and life without parole. He acknowledged that he would give equal consideration to the three available punishments (Tr. I, 197-98). After being advised of the aggravators alleged by the State and the process by which a defendant becomes death eligible, J.S. agreed with statements made by other panel members and indicated that he had no difficulty with considering the aggravators individually and with respect to each alleged homicide (Tr. I, 229). Finally, and again like D.B., J.S. indicated that he would not enter deliberations with a preconceived outcome, but would use the instructions to arrive at his decision (Tr. II, 236). Defense counsel posed no individual questions to J.S.

13

At the conclusion of questioning of the second panel, defense counsel asked that J.S. be removed for cause. In support of his request, defense counsel pointed to J.S.'s questionnaire answer that if the defendant were found guilty, he would be put on death row and eventually executed. In what habeas counsel labels a misstatement, defense counsel also argued to the trial court that J.S.'s in-court answers did not differ from his questionnaire answers (Tr. II, 276). (Pet. at 27 n.13.) The trial court overruled the challenge (Tr. II, 279). J.S. came into the jury box when defense counsel exercised his ninth and final peremptory challenge (O.R. IV, 771; Tr. III, 517-18). Out of peremptory challenges, defense counsel requested two additional peremptory challenges, one of which he would have used to remove J.S. (Tr. III, 518-19).

On direct appeal, Petitioner challenged the trial court's failure to remove J.S. for cause. In denying relief, the OCCA noted that "after having been advised of the three possible punishments for a conviction of first-degree murder, Juror J.S. stated unequivocally that he could consider all three punishment options, and follow the law and the instructions given to him by the court." Eizember, 2007 OK CR 29, ¶ 43, 164 P.3d at 222 (footnote omitted).

> Comparing his statements during *voir dire* with his responses on his written questionnaire, we find his responses do not indicate an intention to disregard or circumvent the law or the court's instructions. As [sic] most, his response that "if guilty, [Petitioner] will be on death row and eventually executed" indicates a misunderstanding of the law. Such is not sufficient to strike a prospective juror for cause. "If all prospective jurors who did not fully understand the law before the trial began were struck, only lawyers would be allowed to serve on jurys [sic] (and only a handful of lawyers at that"). Brown v. Lambert, 451 F.3d 946, 952 (9th Cir. 2006).

. . . .

Having reviewed the entirety of J.S.'s *voir dire*, oral as well as written responses, we have no doubts regarding his ability to be a fair and impartial juror. His responses clearly showed he did not hold views regarding punishment that would prevent or substantially impair the performance of his duty as a juror in accordance with his instructions and oath as a juror. The trial court did not abuse its discretion in denying [Petitioner's] for cause challenge.

Id. at ¶¶ 43, 47, 164 P.3d at 222, 223. The OCCA also found no merit to the argument that J.S., who had heard about the case in the media, was "overly eager" to serve as a juror. Id. at ¶¶ 45-46, 164 P.3d at 222-23.

**Juror A.S.** On the questionnaire, A.S. indicated he was in favor of the death penalty. In explanation of his opinion, he stated, "If person is convicted of capitol [sic] crime, I believe death penalty should be carryed [sic] out." When asked about his feelings about the death penalty, A.S. stated, "If the defendant is found guilty of a capitol [sic] crime I feel the death penalty should be carried out after one appeal." When asked about the purpose the death penalty serves in society, A.S. cited economic reasons: "it rids society of the expense of housing and feeding & medical care for the rest of his or her life." Regarding the imposition of the death penalty in Oklahoma and whether he felt it was used too often or too seldom, A.S. responded, "Just about right." When asked to choose the statement that best stated his view about capital punishment, A.S. chose "I am in favor of capital punishment, except in a few cases where it may not be appropriate." In addition, when asked to choose the statement that best stated his position on imposing a sentence of life, death, or some other

penalty, A.S. chose "I would usually vote for the death penalty in a case where the law allows me to."

On the questionnaire, A.S. indicated that he wanted to be a juror on the case because he had never served before. Although A.S. had been exposed to the case through media reports, he stated that he had only heard about the manhunt and Petitioner's arrest. He did not know the specific facts of the case and had not yet formed an opinion about it. Because he had not yet formed an opinion, A.S. stated that if he were a party to the case, he would want himself as a juror.

Like both D.B. and J.S., A.S. was also on the second death qualification panel, and he remained silent during the trial court's questioning about each panel member's ability to consider all three punishments (O.R. IV, 769; Tr. I, 173-84). In response to questioning by the prosecutor, A.S. stated that he could impose all three punishments based upon the evidence, but that he "would lean more toward the death or life without parole" (Tr. I, 209). A.S. acknowledged, however, that he could consider a life sentence if the judge instructed him to. Despite his leanings toward a sentence greater than life, A.S. affirmed that he would base his decision on the presented evidence and given instructions (Tr. I, 210). After being advised of the aggravators alleged by the State and the process by which a defendant becomes death eligible, A.S. agreed with statements made by other panel members and indicated that he had no difficulty with considering the aggravators individually and with respect to each alleged homicide (Tr. I, 233).

Defense counsel questioned A.S. about the available punishment options. At first, A.S. indicated that he could consider a life sentence (Tr. II, 241). After further discussion, however, he then said he could not (Tr. II, 242). In explanation of why he could not consider a life sentence, A.S. stated, "As it's been pointed out earlier life imprisonment could be twenty years for a heinous crime, given good time and to me that's not just punishment for a crime that severe" (Tr. II, 242). Despite his apparent inability to consider a life sentence, A.S. nevertheless stated that he felt eligible to sit on the jury and "judge . . . all the evidence" (Tr. II, 243). When defense counsel questioned A.S.'s eligibility to serve given his statements about consideration of a life sentence, A.S. explained as follows:

> That [a life sentence] would be my third choice obviously, that would be the lesser of the three choices. It would be, I would be having to vote with eleven other folks and listen to all of their, their evidence. That would be down my list on the choices, let's put it that way.
>
> . . . .
>
> I could consider it [a life sentence], I'm not trying to back track or anything but I could consider that.

(Tr. II, 243-44). When defense counsel followed up with a question about A.S.'s ability to consider the life without parole option, A.S. stated that life without parole "would be a better option for [him] based on the evidence if the evidence proves to be true" (Tr. II, 244).

At the conclusion of questioning of the second panel, defense counsel asked that A.S. be removed for cause. In support of his request, defense counsel pointed to A.S.'s questionnaire answer that the death penalty should be carried out against one found guilty of a capital crime. Defense counsel also referred to A.S.'s differing answers on whether he

could consider a life sentence, arguing that A.S. was a "potential" ineligible juror due to his inability to consider all possible punishments (Tr. II, 275-76). The trial court overruled the challenge (Tr. II, 279). A.S. came into the jury box when defense counsel exercised his seventh peremptory challenge (O.R. IV, 771; Tr. III, 516). Before exercising his eighth peremptory challenge, defense counsel unsuccessfully renewed his challenge to remove A.S. for cause. Defense counsel then used his eighth peremptory challenge to remove A.S. (Tr. III, 516-17).

On direct appeal, Petitioner asserted that the trial court abused its discretion in failing to grant his request to remove A.S. for cause. In denying relief, the OCCA found as follows:

> When read in isolation, certain responses by A.S., both in his written questionnaire and oral *voir dire*, seem to indicate some partiality. However, when read in context of the remaining *voir dire*, his responses indicate his personal views on capital punishment. Responses on the written questionnaire indicating general support for the death penalty and the personal view that harsher punishment is necessary to rectify the burgeoning crime problem in society do not reflect an inherent bias against [Petitioner] or in favor of the death penalty. A.S. stated at least four times he could follow the court's instructions and consider all punishment options. Capital jurors are not to be struck for cause unless they are unable to follow the court's instructions. In light of A.S.'s verbal responses that he could set aside any personal beliefs and judge the case based on the evidence presented at trial, that he could consider all punishment options and would follow the law as instructed by the court, his written responses expressing his personal views do not warrant removal for cause.

> Any doubts regarding the ability of A.S. to be a fair and impartial juror were resolved by the trial court. Responses which, on the written record of appeal, may seem to substantially impair a prospective juror's ability to follow the law, may not appear the same to the trial judge who sees and hears the responses first hand. Here, the record supports the trial court's finding. Therefore, the trial court did not abuse its discretion in denying the for cause challenge, and this assignment of error is denied.

Eizember, 2007 OK CR 29, ¶ 63-64, 164 P.3d at 227 (citations omitted) (footnote omitted).

**Analysis.** There is no question that "[c]apital defendants have the right to be sentenced by an impartial jury." Uttecht v. Brown, 551 U.S. 1, 22 (2007). "[D]ue process alone has long demanded that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment." Morgan v. Illinois, 504 U.S. 719, 727 (1992). An impartial juror in the capital setting is one who, despite his or her views on capital punishment, can follow the trial court's instructions. Thus, "the proper standard for determining when a prospective juror may be excluded for cause because of his or her views on capital punishment . . . is whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with the instructions and his oath.'" Wainwright v. Witt, 469 U.S. 412, 424 (1985).

"[B]ecause determinations of juror bias cannot be reduced to question-and-answer sessions[,]" the printed record cannot fully capture the qualification assessment. Id. at 424-26, 434-35. Reviewing courts must therefore defer to the trial court's determination of whether a particular juror is qualified to serve. "Deference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." Uttecht, 551 U.S. at 9. Adding to this deference is the AEDPA deference a federal habeas court must afford a state court decision under 28 U.S.C. § 2254(d), and in addition, because the state trial court's determination is a factual one, it is presumed correct

under 28 U.S.C. § 2254(e)(1). <u>Witt</u>, 469 U.S. at 429; <u>Johnson v. Gibson</u>, 254 F.3d 1155, 1160 (10th Cir. 2001). Under these conditions, a habeas petitioner challenging juror cause determinations faces a high hurdle, one Petitioner has failed to overcome in the present case.

Although Jurors D.B., J.S., and A.S. all gave varying answers which, when read in isolation and from a bare record, might cause one to question their impartiality, they also gave answers which reflected their ability to consider all three punishments in light of the presented evidence and the trial court's anticipated instructions. This mixed bag of responses highlights the very reason why a reviewing court must defer to a trial court's resolution of a juror's ability to serve. In <u>Patton v. Yount</u>, 467 U.S. 1025 (1984), one of the many Supreme Court cases to acknowledge the deference due a trial court's assessment of juror impartiality,[6] the Supreme Court aptly posed the question as follows:

> Thus the question is whether there is fair support in the record for the state courts' conclusion that the jurors here would be impartial. The testimony of each of the three challenged jurors is ambiguous and at times contradictory. This is not unusual on voir dire examination, particularly in a highly publicized criminal case. It is well to remember that the lay persons on the panel may never have been subjected to the type of leading questions and cross-examination tactics that frequently are employed, and that were evident in this case. Prospective jurors represent a cross section of the community, and their education and experience vary widely. Also, unlike witnesses, prospective jurors have had no briefing by lawyers prior to taking the stand. Jurors thus cannot be expected invariably to express themselves carefully or even consistently. Every trial judge understands this, and under our system it is that judge who is best situated to determine competency to serve impartially. The trial judge properly may choose to believe those statements that were the

---

[6] See <u>Uttecht</u>, 551 U.S. at 9, 20, 22; <u>Witt</u>, 469 U.S. at 426-30; <u>Darden v. Wainwright</u>, 477 U.S. 168, 175-78 (1986).

most fully articulated or that appeared to have been least influenced by leading.

Patton, 467 U.S. at 1038-39 (citation omitted). In denying Petitioner relief on appeal, the OCCA afforded this deference to the trial court's rulings, and applying Supreme Court precedent, found that none of these jurors had views which would "'prevent or substantially impair the performance of [their] duties as [jurors] in accordance with the instructions and [their] oath.'" Witt, 469 U.S. at 424; Eizember, ¶¶ 41-42, 47, 57, 64, 164 P.3d at 223, 226, 227. The AEDPA requires this Court to give deference to the OCCA's determination and a presumption of correctness to the state courts' findings that the challenged jurors were qualified to serve.

Although Petitioner is correct that AEDPA deference is "not a blank check made payable to 'automatic affirmance'" (Reply at 5), with respect to claims challenging juror qualification, Supreme Court precedent dictates the denial of relief where the record discloses *some* basis for the trial court's ruling. See Uttecht, 551 U.S. at 20 ("The need to defer to the trial court's ability to perceive jurors' demeanor does not foreclose the possibility that a reviewing court may reverse the trial court's decision where the record discloses *no* basis for a finding of substantial impairment.") (emphasis added). As argued by Respondent, the most that Petitioner has shown is ambiguity. Ambiguity, which the Supreme Court weighs in favor of the State, falls short of the high burden Petitioner must meet to obtain relief on his Grounds I and II. Witt, 469 U.S. at 434 ("[W]hatever ambiguity [may be found] in this record, we think that the trial court, aided as it undoubtedly was by its assessment of [the

juror's] demeanor, was entitled to resolve it in favor of the State.").  See also Uttecht, 551

U.S. at 7 (quoting Witt).  Relief on these grounds is therefore denied.

**B.     Ground III:  Life Sentence Misconception.**

In Ground III, Petitioner asserts that violations of the Sixth, Eighth, and Fourteenth

Amendments occurred when the trial court failed to appropriately respond to information

injected into the death qualification questioning of the second panel.  Because the

information concerned the meaning of a life sentence and because five jurors from the second

panel ultimately sat on the jury, Petitioner asserts that he was denied due process and a

reliable sentencing proceeding because the information resulted in a bias against the life

sentence option.  Respondent asserts that the Eighth Amendment portion of this claim is

unexhausted and that with respect to the due process portion of his claim, Petitioner has

failed to show that the decision of the OCCA is contrary to or an unreasonable application

of Supreme Court law.

In the process of death qualifying the second panel, Juror P.M., a former federal

correctional officer, asked the prosecutor to explain a life sentence in the state system (Tr.

I, 167-68, 200).  The prosecutor responded that a life sentence is life in prison with the

possibility of parole.  P.M. stated that he knew that much, but what he wanted to know was

how long a life sentence was in terms of years.  He said he had heard that a life sentence was

twenty years and that with good time, people with a life sentence could get out of prison in

as little as seven years or after having served "two-thirds of their time or something."  In

response to P.M.'s questions, the prosecutor, at one time even encouraging defense counsel

22

to correct him if he was wrong, told P.M. that there was no definitive answer to his question and that it just depends (Tr. I, 200-01).[7]

During defense counsel's questioning of the second panel, two jurors, Jurors A.S. and A.B., when asked about their ability to consider a life sentence, made reference to P.M.'s comments. As previously discussed with reference to Petitioner's second ground for relief, supra, at one point in his dialogue with defense counsel, A.S. stated that in light of P.M.'s comments, he would not be able to consider a life sentence (Tr. II, 242).[8] A.B's reference was in the form of a question. She asked whether, in light of P.M.'s comments, the judge would give the jury additional information about a life sentence at the time of sentence consideration. After first giving the trial court an opportunity to answer the question, defense counsel told A.B. that he anticipated the jury would be instructed on the three sentencing options only and without any further guidance (Tr. II, 244-46).

Although Juror L.L. did not specifically reference P.M.'s comments, Petitioner notes that she did engage in a lengthy dialogue with both defense counsel and the trial court over her ability to consider a life sentence. In the course of this discussion, the trial court told her, "it has been told to you I am not, we are not going to tell you what a life sentence is because we don't know it. A life sentence may be a life sentence, it may not be, okay?" (Tr. II, 253-

---

[7] P.M. did not sit on the jury, but was removed from the panel by the State's exercise of its second peremptory challenge (O.R. IV, 771; Tr. III, 512).

[8] As previously noted, A.S. did not sit on the jury. Defense counsel used his eighth peremptory challenge to remove him (O.R. IV, 771; Tr. III, 516-17).

57).[9]  Finally, Juror V.P., making reference to P.M.'s comments as did A.S. and A.B., expressed an inability to impose a life sentence:

> I listened to the Judge and I just don't know that I can say that they deserve life.  I mean I agreed to listen to all the, you know, to go along with all of them, you know, to consider all the options and I would consider all that but I don't know when it came right to it if I could say that they deserved life.

(Tr. II, 259).  When defense counsel asked that V.P. be excused, the trial court made the following comment:

> Now I think we have got this seven or eight years floating around but there is just one figure missing and I am not, no one knows what life means, okay? We, all we tell you is life means life.  That is all that we are allowed to say, all right but I certainly don't want to represent that there is some figure, a magic figure and I don't know where seven or eight years came from . . . .

(Tr. II, 260).[10]

At the conclusion of questioning of the second panel, and in addition to cause challenges made against individual jurors, defense counsel asked the trial court to excuse the entire second panel for cause because of P.M.'s comments.  Due to P.M.'s comments, defense counsel asserted that a vast majority of the jurors on the second panel would be unable to "realistically consider" the life sentence option (Tr. II, 277).  The trial court denied the request (Tr. II, 279).

---

[9] L.L. did not sit on the jury because defense counsel's cause challenge to her was granted by the trial court (Tr. II, 396).

[10] V.P. did not sit on the jury because defense counsel's cause challenge to her was granted by the trial court (Tr. II, 396).

Petitioner presented this claim to the OCCA on direct appeal.[11] The OCCA concluded that relief was unwarranted. Noting the discretion afforded a trial court in conducting voir dire, the OCCA found that the trial court did not abuse its discretion in failing to employ one of the curative measures suggested by Petitioner on appeal.[12] Eizember, 2007 OK CR 29, ¶¶ 65-70, 164 P.3d at 228-29. As to the trial court's failure to specifically advise the second panel that a life sentence would require Petitioner to serve 85% of the sentence before being eligible for parole, the OCCA found no miscarriage of justice or the denial of a constitutional or statutory right. Id. at ¶¶ 71-73, 164 P.3d at 229. A key component of the OCCA's denial of relief was the additional finding that, despite any misconceptions about the length of a life sentence that were batted around during the death qualification of the second panel, Petitioner had failed to demonstrate that the five jurors from the second panel who actually sat on the jury were not impartial.

> Five people from the second group, J.S., D.B., G.P., R.B., and A.B. ultimately sat on [Petitioner's] jury. It is clear from their responses, both written and oral,

---

[11] Respondent is correct that the Eighth Amendment portion of Petitioner's claim is unexhausted and subject to an anticipatory procedural bar; however, other deficiencies plague this argument as well. In addition to being scantily referenced and supported (Pet. at 45, 54, 62), it is, for the reasons set forth herein, also without merit. See 28 U.S.C. § 2254(b)(2) ("An application for a writ of habeas corpus may be denied on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the courts of the State.").

[12] The curative measures suggested by Petitioner included continuing the examination of P.M. apart from the panel, excusing the entire panel, and advising the jury of the 85% Rule (during voir dire, in the jury instructions, and/or in response to jury questions about sentencing matters). In his Ground IV, Petitioner expands upon and more directly challenges the trial court's failure to give Petitioner's requested instruction on the 85% Rule and to make reference to the 85% Rule within its response to jury questions about sentencing matters.

that each of these jurors could be a fair and impartial juror, consider all three penalty options, and follow the law and instructions given by the court.

. . . .

The record clearly shows defense counsel was allowed sufficient *voir dire* of the second panel to determine if there were grounds to challenge a particular juror for cause and to intelligently exercise peremptory challenges. The response of each of the five individuals from the second panel who served on the jury showed they could consider all three punishment options and that each understood that a life sentence was something different from a sentence of life without the possibility of parole and a sentence of death. Any isolated comments regarding parole or parole eligibility were not sufficient to deny [Petitioner] a fair trial. See Wade v. State, 1992 OK CR 2, ¶ 15, 825 P.2d 1357, 1361-62 (prospective juror's comment that she could not fairly consider life imprisonment as a possible punishment, "because in Oklahoma a life sentence usually doesn't turn out that way" found to be an "unfortunate" comment, but not grounds for reversal as each juror empanelled and sworn to try appellant's case stated that they could be impartial and give appellant a fair trial).

Id. at ¶¶ 70, 72, 164 P.3d at 229.

Petitioner seeks relief from the OCCA's decision by asserting that it is in conflict with several Supreme Court decisions. In support of his due process claim, Petitioner cites Simmons v. South Carolina, 512 U.S. 154 (1994), as well as related cases, Shafer v. South Carolina, 532 U.S. 36 (2001), and Kelly v. South Carolina, 534 U.S. 246 (2002).[13] In Simmons, a plurality opinion, the Supreme Court held that "where the defendant's future dangerousness is at issue, and state law prohibits the defendant's release on parole, due

---

[13] In Shafer, a majority of the Court, addressing a new South Carolina sentencing scheme, reaffirmed the Simmons holding. Shafer, 532 U.S. at 51. In Kelly, a majority of the Court once again acknowledged Simmons as controlling authority, applying it a second time to a South Carolina case. Kelly, 534 U.S. at 248.

process requires that the sentencing jury be informed that the defendant is parole ineligible." Simmons, 512 U.S. at 156. Because the jury in Simmons may have reasonably believed that Simmons could be paroled if given a life sentence, the Court found that an unacceptable "misunderstanding pervaded the jury's deliberations" – one which "had the effect of creating a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." Id. at 161. The Court reasoned that

> if the State rests its case for imposing the death penalty at least in part on the premise that the defendant will be dangerous in the future, the fact that the alternative sentence to death is life without parole will necessarily undercut the State's argument regarding the threat the defendant poses to society. Because truthful information of parole ineligibility allows the defendant to "deny or explain" the showing of future dangerousness, due process plainly requires that he be allowed to bring it to the jury's attention by way of argument by defense counsel or an instruction from the court.

Id. at 168-69. Because Oklahoma's sentencing scheme includes two clearly delineated life imprisonment options, one with parole eligibility and one without, the Tenth Circuit has held that it does not, on its face, run afoul of Simmons. However, the Tenth Court has found that a due process violation may occur where the trial court injects information into the deliberation process which thereby causes the "false choice" found constitutionally impermissible in Simmons. Littlejohn v. Trammell, 704 F.3d 817, 827-28 (10th Cir. 2013).

While acknowledging that the situation in his case is not the precise issue addressed in Simmons, Petitioner argues that the same issues/concerns are present, i.e., "the constitutional prerequisite that capital sentencing jurors be given accurate, reliable information." (Pet. at 46.) This, however, does not satisfy Petitioner's burden of proof. To

obtain relief under the AEDPA, Petitioner must show that the OCCA's decision is contrary to or an unreasonable application of "clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). "That statutory phrase refers to the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "[F]ederal courts may no longer extract clearly established law from the general legal principles developed in factually distinct contexts." House v. Hatch, 527 F.3d 1010, 1017 n.5 (10th Cir. 2008). Petitioner's ability to obtain relief hinges on his ability to point to "Supreme Court precedent clearly establishing the legal right on which [his] claim is premised." Lambert v. Workman, 594 F.3d 1260, 1263 (10th Cir. 2010).

Simmons and its progeny are inapplicable to Petitioner's claim. As discussed above, Simmons protects against the "false choice." Its holding requires jury notification of a capital defendant's parole ineligibility when the State has alleged that he is a continuing threat. This notification prevents "a false choice between sentencing petitioner to death and sentencing him to a limited period of incarceration." Simmons, 512 U.S. at 161. See Ramdass v. Angelone, 530 U.S. 156, 166 (2000) (noting that "Simmons created a workable [and limited] rule."). In Petitioner's case, the jury was not faced with this false choice, but was given three sentencing options: life, life without parole, and death (O.R. VI, 1039). This

in and of itself is <u>Simmons</u> compliant.  In addition, this is not a situation where a false choice was created by the trial court.[14]

The Eighth Amendment aspect of Petitioner's claim does not enhance his ability to obtain relief.  For this portion of his claim, Petitioner cites the Supreme Court's decisions in <u>Walton v. Arizona</u>, 497 U.S. 639 (1990), <u>Boyde v. California</u>, 494 U.S. 370 (1990), and <u>Mills v. Maryland</u>, 486 U.S. 367 (1988), asserting that in these line of cases, "the Supreme Court has held that capital sentencing juries must be fully informed as to the sentencing scheme and has found Eighth Amendment violations where jury instructions reasonably could have misled capital jurors."  (Pet. at 45.)  This argument fails at the threshold because it is premised not on clearly established federal law, but on "general legal principles developed in factually distinct contexts."  <u>House</u>, 527 F.3d at 1017 n.5.  <u>See</u> <u>Littlejohn</u>, 704 F.3d at 830 n.5 (rejecting a similar argument based on general principles drawn from several Supreme Court cases interpreting the Eighth Amendment, including <u>Walton</u>, <u>Boyde</u>, and <u>Mills</u>).

---

[14]  The Tenth Circuit has held that a petitioner's due process rights are violated under <u>Simmons</u> when the following circumstances are present:

> (1) the prosecution seeks the death penalty; (2) the prosecution places the defendant's "future dangerousness . . . at issue"; (3) the jury asks for clarification of the meaning of "life imprisonment," or a synonymous statutory term; and (4) the judge's response threatens to cause "a jury's misunderstanding so the jury will . . . perceive a 'false choice' of incarceration when future dangerousness is at issue."

<u>Mollett v. Mullin</u>, 348 F.3d 902, 914 (10th Cir. 2003) (citations omitted).

For the foregoing reasons, the Court finds that Petitioner has failed to show that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law. Petitioner's Ground III is therefore denied.

### C.     Ground IV:  Instruction on Oklahoma's 85% Rule.

In Ground IV, Petitioner asserts error in the trial court's failure to give a requested instruction on Oklahoma's 85% Rule.  The instruction would have advised the jury that he would be required to serve 85% of any life or term of years sentence he received for first degree murder, second degree murder, shooting with intent to kill, and first degree burglary before becoming eligible for parole.  Petitioner contends that without the instruction, the jury inflated his sentences for these crimes.  Petitioner also asserts that when considering a comment made by the prosecutor during closing argument and the second death qualification panel's misguided discussion regarding the length of a life sentence (Ground III), along with the absent instruction, the jury may have been swayed to convict him of first degree murder in order to open up the sentencing options to include a life without parole option, which, according to Petitioner, was "the only sentence the jury could feel confident about."  (Pet. at 64.)  In response, Respondent asserts that Petitioner has not shown that the OCCA's denial of relief on this claim is contrary to or an unreasonable application of Supreme Court law.

"A habeas petitioner who seeks to overturn his conviction based on a claim of error in the jury instructions faces a significant burden."  <u>Ellis v. Hargett</u>, 302 F.3d 1182, 1186 (10th Cir. 2002).  The question is one of due process, i.e., whether the petitioner was denied a fair trial as a result of the instructional error.  <u>Cummings v. Sirmons</u>, 506 F.3d 1211, 1240

(10th Cir. 2007) (citing Henderson v. Kibbe, 431 U.S. 145, 154 (1977), and Cupp v. Naughten, 414 U.S. 141, 147 (1973)). Where, as here, the issue is the omission of an instruction Petitioner asserts should have been included, the Supreme Court has acknowledged that it "is less likely to be prejudicial than a misstatement of the law." Henderson, 431 U.S. at 155. The Supreme Court has additionally advised that "[t]he significance of the omission . . . may be evaluated by comparison with the instructions that were given." Id. at 156. However, mere speculation that the jury might have reached a different result if given the additional instruction is insufficient "to justify the conclusion that constitutional error was committed." Id. at 157.

In denying Petitioner relief on this claim, the OCCA determined that Petitioner was not prejudiced by the trial court's failure to give an instruction on the 85% Rule. Eizember, 2007 OK CR 29, ¶¶ 100-03, 164 P.3d at 234-35. Having previously noted that at the time of Petitioner's trial "the long standing rule was that the trial court should not comment or instruct the jury on parole eligibility[,]" the OCCA acknowledged the holding of Anderson v. Oklahoma, 2006 OK CR 6, 130 P.3d 273, the OCCA case which altered this rule, and its applicability to Petitioner's case (Anderson was issued while Petitioner's direct appeal was pending). Id. at ¶ 71, 164 P.3d at 229. Nevertheless, the OCCA found that the failure to give an instruction on the 85% Rule was subject to harmless error review and, contrary to Petitioner's assertions, the OCCA found that his sentences were most likely the result of the strong evidence of his guilt and not the absence of an instruction on the 85% Rule. Id. at ¶¶ 101-03, 164 P.3d at 234-35.

Petitioner has not shown that the OCCA's decision is contrary to or an unreasonable application of Supreme Court law. In the first instance, Petitioner's claim is based on state law. Beyond the limited circumstances of Simmons, previously discussed with reference to Petitioner's third ground for relief, the Supreme Court has not mandated that a jury be told about a defendant's parole eligibility. In fact, the Supreme Court has specifically acknowledged that the States have discretion in this area. Simmons, 512 U.S. at 168 (citing California v. Ramos, 463 U.S. 992, 1014 (1983), "for the broad proposition that [the Supreme Court] generally will defer to a State's determination as to what a jury should and should not be told about sentencing."). See also Ramdass, 530 U.S. at 165 (acknowledging that O'Dell v. Netherland, 521 U.S. 151, 166 (1997), "reaffirmed that the States have some discretion in determining the extent to which a sentencing jury should be advised of probable future custody and parole status in a future dangerous case, subject to the rule of Simmons"); O'Dell, 521 U.S. at 166 (noting that Simmons "carved out an exception to the general rule described in Ramos . . . for the first time ever"). Under these circumstances, Petitioner's claim is nothing more than a state law claim, and "it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions." Estelle v. McGuire, 502 U.S. 62, 67-68 (1991). See also Parker v. Sirmons, 384 F. App'x 750, 752 (10th Cir. 2010) (unpublished) (finding no due process violation for Anderson error); Gardner v. Jones, 315 F. App'x 87, 91-92 (10th Cir. 2009) (unpublished) (acknowledging the limited holding of Simmons and finding that a petitioner was not denied a fundamentally fair trial "in a constitutional sense" by the trial court's failure to instruct the jury on the 85% Rule); Taylor

v. Parker, 276 F. App'x 772, 775-76 (10th Cir. 2008) (unpublished) (failure to instruct on the 85% Rule did result in a fundamentally unfair trial).

In addition, Petitioner has not shown that the absence of an instruction on the 85% Rule denied him a fundamentally fair trial. The OCCA's determination that Petitioner's sentences were largely the result of the crimes he committed and admitted is reasonable. Although Petitioner set out on October 18, 2003, to settle issues he had with Ms. Biggs, he instead unleashed violence upon her small town which resulted in the deaths of her elderly neighbors, the shooting of her son, and the beating of her mother, all in her absence. Petitioner argues that his sentences were the result of the jury's concerted effort to prevent any early release. That appears to be precisely the case. However, the most logical conclusion to be drawn from the jury's action is that it was based upon the strong evidence of guilt and not the lack of knowledge that many of Petitioner's crimes would require significant prison time before becoming eligible for parole.[15]

In conclusion, for the reasons set forth above, Petitioner has not demonstrated his entitlement to relief on Ground IV. Ground IV is therefore denied.

### D.  Grounds V, VI, and VII:  Lesser-Included Instructions.

In Grounds V, VI, and VII, Petitioner, with primary reliance on the Supreme Court's decision in Beck v. Alabama, 447 U.S. 625 (1980), challenges the trial court's instructions

---

[15]  If in fact the issue of parole was the jury's primary concern, the jury could have selected the life without parole option with respect to his Count 2 conviction.

on lesser-included offenses. Petitioner's Grounds V and VI relate to his first degree murder conviction of Mr. Cantrell. In Ground V, Petitioner challenges the OCCA's harmless error determination with respect to the trial court's misinstruction on the lesser-included offense of second degree murder by imminently dangerous conduct, and in Ground VI, Petitioner asserts that the jury should have also been instructed on the lesser-included offense of heat of passion manslaughter. In Ground VII, relating to his conviction for shooting with intent to kill Tyler, Petitioner asserts that the jury should have also been instructed on the lesser-included offense of assault and battery with a dangerous weapon. Respondent contends that Petitioner has failed to demonstrate his entitlement to relief on any of these grounds.

In <u>Beck</u>, the Supreme Court addressed the constitutional ramifications of lesser-included instructions for a capital crime. Prior to <u>Beck</u>, the Supreme Court had "never held that a defendant is entitled to a lesser included offense instruction as a matter of due process." <u>Beck</u>, 447 U.S. at 637. In <u>Beck</u>, however, the Supreme Court carved out an exception for those high-stake cases where the death penalty is a possible punishment.

> For when the evidence unquestionably establishes that the defendant is guilty of a serious, violent offense–but leaves some doubt with respect to an element that would justify conviction of a capital offense–the failure to give the jury the "third option" of convicting on a lesser included offense would seem inevitably to enhance the risk of an unwarranted conviction.

> Such a risk cannot be tolerated in a case in which the defendant's life is at stake. As we have often stated, there is a significant constitutional difference between the death penalty and lesser punishments . . . .

Id. Beck, therefore, requires a trial court in a capital case to give the jury a third option to convict the defendant for a lesser-included non-capital offense, when such lesser offense is supported by the evidence. Id. at 627. Beck does not, however, require instructions on every lesser-included non-capital offense supported by the evidence. In Schad v. Arizona, 501 U.S. 624 (1991), the Supreme Court acknowledged the "strict holding of Beck" and found that when a jury is given a "third option," Beck is not implicated because a jury is "not faced with an all-or-nothing choice between the offense of conviction (capital murder) and innocence." Schad, 501 U.S. at 645-48. See Bland v. Sirmons, 459 F.3d 999, 1016 (10th Cir. 2006) (citing Schad; the Beck "rule is not implicated when the court instructs the jury on one lesser included offense supported by the evidence, even if instructions on other lesser included offenses might have been warranted").

### 1. Ground V: Misinstruction on Second Degree Murder by Imminently Dangerous Conduct.

With respect to both first degree murder charges Petitioner faced, Petitioner requested and received an instruction on the lesser-included offense of second degree murder by imminently dangerous conduct. The instruction, however, misstated the fifth element. Instead of describing the criminal conduct as having been done without an intention to take life, the instruction went further and erroneously described the conduct as having been done without the intention to take life *or harm the individual* (O.R. V, 972). Given Petitioner's

assertion that he never intended to kill Mr. Cantrell and the evidence that he clearly intended to harm him, the misstatement effectively eliminated this lesser-included offense from the jury's consideration. Although the OCCA acknowledged the error, it found the error harmless. <u>Eizember</u>, 2007 OK CR 29, ¶¶ 104-09, 164 P.3d at 235-36. Petitioner contends that the OCCA's holding is a "misreading" of both <u>Beck</u> and <u>Schad</u>.

In denying Petitioner relief, the OCCA held as follows:

> The record reflects that to both Counts I and II, the jury was instructed on first degree malice aforethought murder, second degree felony murder, and second degree murder by imminently dangerous conduct. The jury was clearly able to understand and apply the instructions as they found [Petitioner's] culpability was the not the same in the two murders. That the jury returned a verdict for second-degree felony murder as to Count I, the murder of Mrs. Cantrell, shows that offense was an available option for first-degree malice aforethought murder. If the jury had believed [Petitioner's] statements that he did not intend to kill Mr. Cantrell, they could have found Mr. Cantrell's murder occurred during the course of a burglary, as they found with Mrs. Cantrell's murder. The jury's first degree malice murder verdict in Count II, and by implication rejection of the second degree felony murder alternative, and the second degree felony murder verdict in Count I, demonstrates the misinstruction of the jury was not outcome determinative and the jury would not have convicted [Petitioner] of second degree felony murder [sic] in Count II if properly instructed.

> The viability of second degree felony murder as an alternative to a finding of first degree malice murder in Count II satisfies the requirement of <u>Schad v. Arizona</u>, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) and <u>Beck v. Alabama</u>, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980) that, when supported by the evidence, the jury must be given the option of convicting the defendant of a non-capital offense. <u>See</u> <u>Williams [v. State]</u>, 2001 OK CR 9, at ¶ 31, 22 P.3d [702] at 713–714. Accordingly, we find the misinstruction of the jury harmless beyond a reasonable doubt, and this assignment of error is denied.

<u>Id.</u> at ¶¶ 108-09, 164 P.3d at 235-36.

Although Petitioner contends that the OCCA misread both <u>Beck</u> and <u>Schad</u>, it is clear that Petitioner is the one attempting to extend the holdings of these cases. Petitioner's argument is that <u>Beck</u> and <u>Schad</u> are not satisfied unless the jury is instructed on the most specific non-capital offense, the one that "most closely tracks the evidence in the case." (Pet. at 76.) He, of course, argues that with respect to Mr. Cantrell, second degree murder by imminently dangerous conduct was that particular non-capital offense. While <u>Beck</u> holds that the lesser offense must be supported by the evidence and <u>Schad</u> suggests that <u>Beck</u> would not be satisfied by simply instructing on any lesser offense, even one not supported by the evidence, neither case mandates that the jury be instructed on what a particular defendant may deem the most applicable lesser offense. <u>Schad</u> reinforces the narrow holding of <u>Beck</u> and its finding of a constitutional infirmity when a capital jury is not given a third option. <u>Schad</u>, 501 U.S. at 646-47. The third option is a lesser offense supported by the evidence – one which enhances the "rationality and reliability" of the jury deliberation process by giving the jury, who is otherwise convinced of a defendant's guilt but questions whether the evidence supports a capital crime, an acceptable middle-ground choice. It is intended to avoid "the risk that the jury will convict, not because it is persuaded that the defendant is guilty of capital murder, but simply to avoid setting the defendant free." <u>Spaziano v. Florida</u>, 468 U.S. 447, 455 (1984).

In its decision, the OCCA found that even though the instruction on second degree murder by imminently dangerous conduct was defective, the jury was nevertheless given a third option, satisfying both <u>Beck</u> and <u>Schad</u>, because the jury was also instructed on the

lesser-included offense of second degree felony murder. If second degree felony murder was in fact a viable third option for the jury, then the OCCA's decision is clearly not contrary to or an unreasonable application of <u>Beck</u> and <u>Schad</u>. However, Petitioner continues to argue, as he did to the OCCA, that second degree felony murder was "inapplicable" because "the State failed to establish all the essential elements of the underlying felony of second degree burglary, particularly that an actual 'breaking' occurred and that upon breaking and entering, [Petitioner] harbored an intent to commit a particular felony within the structure." (Pet. at 88 & n.36.) Petitioner's arguments are both disingenuous and unavailing. First and foremost, Petitioner requested and received an instruction on this lesser-included offense (O.R. V, 834, 971). Second, with respect to Mrs. Cantrell, the jury convicted Petitioner of this very crime (O.R. VI, 978).[16]

In requesting that the jury be instructed on second degree felony murder, Petitioner acknowledged that this lesser offense was supported by the evidence. He cannot now claim

---

[16] For the same reasons Petitioner contends that second degree felony murder was inapplicable to the murder of Mr. Cantrell, Petitioner argues that his conviction for the murder of Mrs. Cantrell is not supported by constitutionally sufficient evidence. (Pet. at 104 n.42; Reply at 19-22.) However, Petitioner did not raise a sufficiency of the evidence claim on direct appeal to the OCCA, nor does he present this claim among his grounds for relief before this Court. Although Petitioner argues that he was precluded from attacking the sufficiency of the evidence supporting his conviction for the murder of Mrs. Cantrell, the Court is not convinced that he was unable to raise the claim on direct appeal. <u>See</u> <u>McHam v. State</u>, 2005 OK CR 28, ¶ 21, 126 P.3d 662, 670 ("If the defendant is convicted of the lesser offense and appeals, this Court may consider the sufficiency of the evidence to support the conviction, and whether the defendant was unfairly surprised by the instructions, or accepted the lesser-offense alternative as a benefit."). In any event, the fact that Petitioner did not at least attempt a sufficiency challenge to his conviction for the murder of Mrs. Cantrell is another reason why Petitioner's after-the-fact challenge to the validity of second degree felony murder as a lesser-included offense lacks credibility.

otherwise. See Parker v. Champion, 148 F.3d 1219, 1221-22 (10th Cir. 1998) (precluding habeas relief on an alleged improper instruction where the petitioner requested the instruction at trial); Leverett v. Spears, 877 F.2d 921, 924 (11th Cir. 1989) (relying on the doctrine of invited error to reject a habeas petitioner's claim that Beck was applied to him in an unconstitutional ex post facto manner when petitioner requested the instruction on the lesser-included offense). Moreover, Petitioner's attempt to fault the State for the "inapplicability" of second degree felony murder is misplaced. Beck requires an instruction on a lesser-included offense when the evidence supports it. However, Beck does not dictate the quantum of proof required and, in fact, specifically acknowledges that the quantum of proof varies among the States. Beck, 447 U.S. 627, 636 & n.12. In Oklahoma, when a defendant requests instructions on a lesser-included offense, "the trial court should give them if the evidence reasonably makes out a *prima facie* case for that offense." McHam, 2005 OK CR 28, ¶ 20, 126 P.3d at 669-70. "*Prima facie* evidence of a lesser included offense is that evidence which would allow a jury rationally to find the accused guilty of the lesser offense and acquit him of the greater." Davis v. State, 2011 OK CR 29, ¶ 101, 268 P.3d 86, 116, cert. denied, ___ U.S. ___, 133 S.Ct. 232 (2012). Petitioner's argument, however, is that second degree felony murder did not apply because the State failed to prove all the elements beyond a reasonable doubt. However, as shown herein, that is not the standard. As the Tenth Circuit acknowledged in Hogan v. Gibson, 197 F.3d 1297, 1305 (10th Cir. 1999),

> A Beck claim is not the functional equivalent of a challenge to the sufficiency of the evidence for conviction; rather, Beck focuses on the constitutionality of the procedures employed in the conviction of a defendant in a capital trial and

is specifically concerned with the enhanced risk of an unwarranted capital conviction where the defendant's life is at stake and a reasonable jury could have convicted on a lesser included offense.

In Petitioner's case, the concerns addressed by <u>Beck</u> were addressed. Because Petitioner's jury was not faced with an all-or-nothing choice, <u>Beck</u> and <u>Schad</u> were satisfied and Petitioner's Ground V fails.[17]

## 2. Ground VI: Trial Court's Failure to Sua Sponte Instruct on First Degree Heat of Passion Manslaughter.

Although Petitioner did not request an instruction on first degree heat of passion manslaughter, Petitioner faults the trial court for failing to give this instruction to the jury as a lesser-included offense. An extension of his argument in Ground V, and again with reliance on <u>Beck,</u> Petitioner contends, as he did to the OCCA, that the absence of this lesser-included instruction violated <u>Beck</u> because, in its absence, the jury did not have a third option. Petitioner additionally contends, for the first time, that the OCCA's denial of relief is in conflict with <u>Mullaney v. Wilbur</u>, 421 U.S. 684 (1975), as interpreted and applied by the Tenth Circuit in <u>United States v. Lofton</u>, 776 F.2d 918 (10th Cir. 1985).

Petitioner's <u>Beck</u> claim fails here for three reasons. One, as discussed above, the jury was instructed on second degree felony murder and it therefore functioned as a viable third option. It is clear that <u>Beck</u> "is not implicated when the court instructs the jury on one lesser

---

[17] The Court notes Petitioner's citation to two Tenth Circuit cases, <u>Taylor v. Workman</u>, 554 F.3d 879 (10th Cir. 2009), and <u>Turrentine v. Mullin</u>, 390 F.3d 1181 (10th Cir. 2004), in support of his claim for relief. As Respondent points out, however, <u>Beck</u> relief was granted in these cases because the defective lesser-included instruction was the only lesser-included instruction given. <u>Taylor</u>, 554 F.3d at 885-94; <u>Turrentine</u>, 390 F.3d at 1191-94. Such is not the case here.

included offense supported by the evidence, even if instructions on other lesser included offenses might have been warranted." Bland, 459 F.3d at 1016. Two, Petitioner failed to request the instruction. The Tenth Circuit has repeatedly held that a petitioner may not prevail on a Beck claim premised on a lesser-included instruction he failed to request at trial. Grant v. Trammell, 727 F.3d 1006, 1011-13 (10th Cir. 2013). Three, Petitioner has not shown that the evidence supported the instruction. In reaching its conclusion that a heat of passion instruction was not warranted by the evidence, the OCCA found the absence of sufficient provocation. Eizember, 2007 OK CR 29, ¶ 115, 164 P.3d at 237. As noted by the OCCA, adequate provocation requires improper conduct by the victim. Id. at ¶ 115 n.20, 164 P.3d at 237 n.20. Because Mr. Cantrell was acting in defense of his wife and himself, there was simply no evidence of improper conduct on his behalf.

> [Petitioner's] statements show he instigated the entire incident when he broke into the Cantrells' residence and held Mr. and Mrs. Cantrell hostage at gunpoint. If in fact, Mr. Cantrell grabbed the shotgun, it could reasonably be inferred he was attempting to defend himself and his wife. [Petitioner] even admitted to Creek County investigators he understood Mr. Cantrell was trying to protect his wife. [Petitioner] is not entitled to a heat of passion manslaughter instruction because the victim attempted to defend himself and protect his wife. See Young v. State, 2000 OK CR 17, ¶ 60, 12 P.3d 20, 39; Washington v. State, 1999 OK CR 22, ¶ 13, 989 P.2d 960, 968-969. Further, the fact that Mr. Cantrell may have physically struggled with [Petitioner] for control of the shotgun is not sufficient to establish sufficient provocation in light of [Petitioner's] admitted "superior strength" and the victim's poor health and physical disability. On the basis of the evidence, including [Petitioner's]

statement, the trial court did not abuse its discretion in failing to give an instruction on heat of passion manslaughter.

Id. at ¶ 115, 164 P.3d at 237 (footnotes omitted). For these reasons, Petitioner has failed to show that the OCCA's decision with respect to a heat of passion manslaughter instruction is contrary to or an unreasonable application of Beck.

Regarding Petitioner's references to Mullaney and Lofton, the Court agrees with Respondent that this portion of Petitioner's Ground VI is unexhausted. Therefore, the Court finds that this claim is procedurally barred. Lott v. Trammell, 705 F.3d 1167, 1179 (10th Cir. 2013) (citing Anderson v. Sirmons, 476 F.3d 1131, 1139-40 n.7 (10th Cir. 2007), and applying an anticipatory procedural bar to an unexhausted claim), cert. denied, ___ U.S. ___, 134 S.Ct. 176 (2013). Additionally, however, the Court also notes that the claim fails on its merits. Beyond the fact that Lofton is circuit precedent and not Supreme Court precedent, Mullaney, as expressly curtailed by Patterson v. New York, 432 U.S. 197 (1977), is limited "to situations where a fact is presumed or implied against a defendant." Bland, 459 F.3d at 1013. As the Patterson Court found, Mullaney does nothing more than hold the prosecution to its burden of proof, while prohibiting any burden shifting of essential elements of the offense. "Such shifting of the burden of persuasion with respect to a fact which the State deems so important that it must be either proved or presumed is impermissible under the Due Process Clause. . . . *It was unnecessary to go further in Mullaney*." Patterson, 432 U.S. at 215 (emphasis added). Because Petitioner makes no claim that the State was not held to its burden of proof and/or that any essential facts were presumed or implied against him,

Petitioner has failed to show that the OCCA's decision is in any way contrary to or an unreasonable application of <u>Mullaney</u>.  Accordingly, this portion of Petitioner's Ground VI fails as well.

**3.      Ground VII:          Trial Court's Failure to Sua Sponte Instruct on Assault and Battery with a Dangerous Weapon as a Lesser-Included Offense of Shooting with Intent to Kill.**

Petitioner's final attack on the instructions concerns the trial court's failure to sua sponte instruct the jury on a lesser-included offense to the non-capital crime of shooting with intent to kill.  As he did in Grounds V and VI, Petitioner once again asserts that the OCCA's failure to grant him relief on this issue is contrary to or an unreasonable application of <u>Beck</u>.  Respondent argues that Petitioner should be denied relief on this ground because, one, it is unexhausted, and two, it is without merit.  Respondent is correct on both points.   As Respondent asserts, while Petitioner did present a claim on direct appeal that the lesser included offense instruction should have been given, Petitioner presented the claim as a state law claim only.  Petitioner did not seek relief under <u>Beck</u>, nor did he even request relief with reference to <u>Beck</u>'s third option rationale.  "'Fair presentation' requires more than presenting 'all the facts necessary to support the federal claim' to the state court or articulating a 'somewhat similar state-law claim.'"  <u>Bland</u>, 459 F.3d at 1011 (<u>quoting</u> <u>Anderson v. Harless</u>, 459 U.S. 4, 6 (1982) (per curiam)).  "'Fair presentation' means that the petitioner has raised the 'substance' of the federal claim in state court."  <u>Id.</u> (<u>quoting</u> <u>Picard v. Connor</u>, 404 U.S. 270, 278 (1971)).  Because the federal claim was not fairly presented to the OCCA, it is

unexhausted and procedurally barred pursuant to the application of anticipatory procedural bar.  Lott, 705 F.3d at 1179.  In addition, the claim is also without merit because Beck applies to capital crimes only.  As the Tenth Circuit acknowledged in Dockins v. Hines, 374 F.3d 935, 938 (10th Cir. 2004),

> The Supreme Court has never recognized a federal constitutional right to a lesser included offense instruction in non-capital cases, see Beck v. Alabama, 447 U.S. 625, 638 n. 14, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), and neither has this court. Our precedents establish a rule of "automatic non-reviewability" for claims based on a state court's failure, in a non-capital case, to give a lesser included offense instruction.

See also Tiger v. Workman, 445 F.3d 1265, 1268 (10th Cir. 2006) (quoting Dockins).  For these reasons, relief is denied on Ground VII as well.

### E.     Ground VIII:     Other Crimes and Bad Acts Evidence.

In Ground VIII, Petitioner asserts, as he did on direct appeal, that a laundry list of other crimes and bad acts evidence was improperly admitted by the trial court.  Petitioner contends that the admission of this evidence was unfairly prejudicial and unduly influential in both stages.  Although Petitioner relies primarily on state law in his argument for relief, Petitioner does cite two Supreme Court cases, Darden v. Wainwright, 477 U.S. 168 (1986), and Donnelly v. DeChristoforo, 416 U.S. 637 (1974), and claims that the challenged evidence violated his Eighth and Fourteenth Amendment rights.

It is well-established that "[f]ederal habeas review is not available to correct state law evidentiary errors . . . ."  Smallwood v. Gibson, 191 F.3d 1257, 1275 (10th Cir. 1999).  See also Thornburg v. Mullin, 422 F.3d 1113, 1128-29 (10th Cir. 2005) (quoting Smallwood);

Spears v. Mullin, 343 F.3d 1215, 1225-26 (10th Cir. 2003) (same).  Thus, when a habeas petitioner complains about the admission of evidence, inquiry is limited to the constitutional issue of whether a due process violation has occurred.  The question is whether the admitted evidence rendered the petitioner's trial fundamentally unfair.  Id.  See Chambers v. Mississippi, 410 U.S. 284, 302 (1973) (finding that the exclusion of critical evidence denied a defendant "a trial in accord with traditional and fundamental standards of due process").  Undefined by specific legal elements, this standard obliges the court to "tread gingerly" and "exercise considerable self-restraint."  Duckett v. Mullin, 306 F.3d 982, 999 (10th Cir. 2002) (internal quotation marks omitted) (quoting United States v. Rivera, 900 F.2d 1462, 1477 (10th Cir. 1990)).  Moreover, no alleged error shall be viewed in isolation, but considered in light of the entire proceeding, including all of the presented evidence, jury instructions, and representations of the parties.  Harris v. Poppell, 411 F.3d 1189, 1197 (10th Cir. 2005) (discussing the application of a fundamental fairness review and quoting Duckett and Le v. Mullin, 311 F.3d 1002, 1013 (10th Cir. 2002)).

In denying Petitioner relief on this claim, the OCCA gave a very detailed analysis of each evidentiary complaint raised by Petitioner.  Eizember, 2007 OK CR 29, ¶¶ 74-99, 164 P.3d at 229-34.  Ultimately, the OCCA concluded as follows:

> Having fully reviewed [Petitioner's] challenges to the other crimes evidence, we find the probative value of this evidence was not outweighed by the danger of unfair prejudice.  See 12 O.S.2001, § 2403.  Further, at the close of evidence, the trial court issued a limiting instruction directing the jury that evidence of other crimes or bad acts was not to be considered proof of guilt or innocence of the offenses on trial, but was to be considered solely as evidence of [Petitioner's] intent, motive, and absence of mistake.  As the trial court did

> not abuse its discretion in admitting the challenged evidence, this assignment
> of error is denied.

Id. at ¶ 99, 164 P.3d at 234.  Ever cognizant of the high standard Petitioner must meet to

obtain relief for this claim, the Court finds it unnecessary to recount each of Petitioner's

evidentiary complaints and the OCCA's reasonable analysis thereof.    Considering

Petitioner's complaints in light of the entire trial proceeding, including the presented

evidence and the given instructions, Petitioner has simply not shown that "all 'fairminded

jurists' would agree that the [OCCA] got it wrong."  Lockett v. Trammell, 711 F.3d 1218,

1231 (10th Cir. 2013) (quoting Richter, 562 U.S. at ___, 131 S.Ct. at 786), pet. for cert. filed,

No. 13-7114, 13A173 (Oct. 24, 2013).  Ground VIII is therefore denied.

### F.    Grounds IX, X, and XI:   Aggravating Circumstances.

In Grounds IX, X, and XI, Petitioner challenges the aggravating circumstances

supporting his death sentence.  In Grounds IX and X, Petitioner presents various arguments

as to why both aggravators supporting his death sentence should be vacated.  In Ground XI,

Petitioner argues that even if his challenges to the aggravators are denied, his death sentence

should nevertheless be vacated because the mitigating circumstances outweighed the

aggravating circumstances.

In Oklahoma, a jury's finding of at least one aggravating circumstance makes a

defendant eligible for a death sentence; however, before imposing a death sentence, the jury

must additionally find that the aggravating circumstances outweigh the mitigating

circumstances.  21 Okla. Stat. § 701.11 ("Unless at least one of the statutory aggravating

circumstances enumerated in this act is so found or if it is found that any such aggravating circumstance is outweighed by the finding of one or more mitigating circumstances, the death penalty shall not be imposed."). When reviewing the sufficiency of evidence supporting an aggravating circumstance, the OCCA applies the standard of review set forth in Jackson v. Virginia, 443 U.S. 307, 319 (1979). Thus, the OCCA "reviews the record in the light most favorable to the State to determine whether any rational trier of fact could have found the facts necessary to support the aggravating circumstance beyond a reasonable doubt." Warner v. State, 2006 OK CR 40, ¶ 119, 144 P.3d 838, 878.

Jackson applies on habeas review as well. Lewis v. Jeffers, 497 U.S. 764, 781 (1990). "Like findings of fact, state court findings of aggravating circumstances often require a sentencer to 'resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts.'" Id. at 782 (quoting Jackson, 443 U.S. at 319). Thus, the Court "'must accept the jury's determination as long as it is within the bounds of reason.'" Lockett, 711 F.3d at 1243 (quoting Boltz v. Mullin, 415 F.3d 1215, 1232 (10th Cir. 2005)). In addition to the deference afforded a jury's verdict, the AEDPA adds another layer of deference to the Court's review of a sufficiency claim. As acknowledged by the Supreme Court in Cavazos v. Smith, 565 U.S. ___, 132 S.Ct. 2, 3-4 (2011) (per curiam),

> The opinion of the Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), makes clear that it is the responsibility of the jury—not the court—to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could

have agreed with the jury. What is more, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable." Renico v. Lett, 559 U.S. [766, 773], 130 S.Ct. 1855, 1862, 176 L.Ed.2d 678 (2010) (internal quotation marks omitted).

See also Parker v. Matthews, 567 U.S. ___, 132 S.Ct. 2148, 2152 (2012) (referring to habeas review of sufficiency claims as a "twice-deferential standard"); Coleman v. Johnson, 566 U.S. ___, 132 S.Ct. 2060, 2062 (2012) (per curiam) (noting that Jackson claims "are subject to two layers of judicial deference"). When reviewing the evidentiary sufficiency of an aggravating circumstance under Jackson, the Court looks to Oklahoma substantive law to determine its defined application. Hamilton v. Mullin, 436 F.3d 1181, 1194 (10th Cir. 2006).

1.    **Ground IX: Great Risk of Death Aggravator.**

In Ground IX, Petitioner claims that the jury's finding of the great risk of death aggravator should be invalidated for several reasons. First, Petitioner claims that the evidence supporting the aggravator is insufficient. Related thereto, Petitioner additionally asserts that because the OCCA found the evidence to be sufficient in his case, its holding supports a finding that the aggravator is being applied in an overbroad and unconstitutional manner. Petitioner's third argument is a claim of prosecutorial misconduct. Petitioner argues that because the prosecutor misled the jury about the application of the aggravator, the jury's finding of the aggravator is unreliable. Finally, Petitioner argues that the trial court erred in failing to sua sponte instruct the jury on the specific requirements of the aggravator.

Petitioner raised these claims on direct appeal. In addressing Petitioner's sufficiency claim, the OCCA first set forth the circumstances under which the great risk of death aggravator applies.

> The aggravating circumstance of "creating a great risk of death is proved by a defendant's acts which create a risk of death to another in close proximity, in terms of time, location, and intent to the killing." Ryder v. State, 2004 OK CR 2, ¶ 77, 83 P.3d 856, 874. "The rationale behind [the great risk of death] aggravator is that, by its very language, there must be a risk of death, that risk must be to more than one person, it must be great, and the defendant must know that risk exists." Jackson v. State, 2006 OK CR 45, ¶ 41, 146 P.3d 1149, 1163-64.
>
> . . . .
>
> It is not the death of more than one person that satisfies this aggravator, but the acts of a defendant that create a great risk of death to at least one other person who is near to the homicide. Jackson, 2006 OK CR 45 at ¶ 43, 146 P.3d at 1163-64. In fact the death of a person other than the homicide victim is not a prerequisite for a finding of this aggravator. See Jones v. State, 2006 OK CR 5, ¶ 102, 128 P.3d 521, 550; Harris [v. State], 2004 OK CR 1 at ¶ 53, 84 P.3d [731] at 751; Salazar v. State, 1996 OK CR 25, ¶ 8, 919 P.2d 1120, 1123; Snow v. State, 1994 OK CR 39, ¶ 24, 876 P.2d 291, 297. The gravamen of the circumstance is not the number of persons killed, but the callous creation of the risk to more than one person. Ryder, 2004 OK CR 2 at ¶ 77, 83 P.3d at 874.

Eizember, 2007 OK CR 29, ¶¶ 123, 125, 164 P.3d at 239. The OCCA then determined that the evidence was sufficient to support the jury's finding of the aggravator.

> By illegally entering the Cantrells' home and holding the couple hostage at gunpoint, [Petitioner] callously created a great risk of death to both individuals. Contrary to [Petitioner's] argument that the second-degree felony murder verdict showed [Petitioner] did not kill Mrs. Cantrell, the verdict clearly showed the jury found Mrs. Cantrell's death was the result of criminal conduct by [Petitioner]. Although the jury may have believed [Petitioner's] statement that he did not fire the shot that hit Mrs. Cantrell, the jury certainly believed he was responsible for her death.

. . . .

Here the evidence was sufficient to show that [Petitioner] knowingly created a great risk of death to both Mr. and Mrs. Cantrell by holding them hostage at gunpoint. <u>See</u> <u>Smith v. State</u>, 1986 OK CR 158, ¶ 31, 727 P.2d 1366, 1373 (aggravator supported "where a defendant during the continuing course of conduct in which a murder is committed, threatens the life of another and has the apparent ability and means of taking that person's life").

The State also argued at trial that [Petitioner's] attacks on Tyler Montgomery and Carla Wright, occurring after the Cantrell murders and across the street, satisfied this aggravator. However, while we find legal and factual support for that finding, we do not need to address that issue at this time as we find the aggravator sufficiently established by [Petitioner's] criminal conduct toward Mrs. Cantrell.

<u>Id.</u> at ¶¶ 126, 129-30, 164 P.3d at 239, 240.

Petitioner's arguments against the OCCA's decision focus on Mrs. Cantrell. Petitioner argues, as he did to the OCCA, that he could not have posed a great risk of death to more than one person because Mrs. Cantrell was already deceased when he forged his attack on Mr. Cantrell. Petitioner additionally asserts that the State failed to prove two qualifying restrictions with respect to the great risk of death aggravator. First, Petitioner asserts that the State failed to prove that he killed (or aided and abetted another to kill) Mrs. Cantrell. Casting blame solely on Mr. Cantrell for Mrs. Cantrell's death, Petitioner asserts that it was not him, but Mr. Cantrell, who knowingly put Mrs. Cantrell at risk. Second, Petitioner asserts that he lacked any intent to kill Mrs. Cantrell. Again, placing blame on Mr. Cantrell for Mrs. Cantrell's death, Petitioner asserts that the great risk of death aggravator was not satisfied because he did not possess the same intent against both Mr. and Mrs.

Cantrell because, irrespective of his intent towards Mr. Cantrell, he never intended to even harm Mrs. Cantrell.

In finding sufficient evidence of the great risk of death aggravator, the OCCA focused on Petitioner's actions of illegally entering the Cantrells' home, obtaining a shotgun therein, and then holding the Cantrells hostage. The OCCA found that these actions satisfied the great risk of death aggravator. The OCCA has repeatedly stressed that the aggravator does not require two deaths. The focus is on the risk knowingly created to others. "The gravamen of the circumstance is not the number of persons killed, but the callous creation of the risk to more than one person." Ryder v. State, 2004 OK CR 2, ¶ 77, 83 P.3d 856, 874. Despite Petitioner's self-serving statements that he never intended to harm Mrs. Cantrell, and his attempt to cast blame on Mr. Cantrell as the catalyst who triggered the events which ultimately resulted in his death and the death of his wife, the fact remains that it was Petitioner who pulled the Cantrells into his dispute with Ms. Biggs. By using their home as a staging area, as Respondent so aptly describes it, Petitioner knowingly created a great risk of death to the Cantrells. The great risk of death aggravator is "proved by a defendant's acts which create a risk of death to another 'in close proximity, in terms of time, location, and intent' to the killing." Id. (citation omitted). By his own admission, Petitioner beat Mr. Cantrell to death immediately after Mr. Cantrell attempted to turn the tables on him by taking possession of the shotgun that Petitioner had used to keep the Cantrells hostage. In light of these facts, and evaluating Petitioner's claim through the AEDPA's double deferential lens,

the Court cannot agree with Petitioner that the OCCA acted unreasonably in finding sufficient evidence to support the great risk of death aggravator.[18]

Petitioner's next complaint concerns the prosecutor's comments to the jury regarding the aggravator. Petitioner claims that the prosecutor's misleading comments resulted in the jury finding the aggravator despite the "dearth of evidence" supporting it. (Pet. at 150.) Allegations of prosecutorial misconduct are subjected to due process review. Hamilton, 436 F.3d at 1187. The question is whether the prosecutor's actions or remarks "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643. Because Petitioner made no objection at trial to the two comments of which he now complains (Tr. X, 1756; Tr. XII, 2188), the OCCA reviewed the comments for plain error only and found that "[a]ny misstatements by the prosecutor were not so egregious as to have denied [Petitioner] a fair trial or to have affected the outcome of the trial." Eizember, 2007 OK CR 29, ¶¶ 131-35, 164 P.3d at 240-41. Given this Court's determination that the OCCA reasonably found sufficient evidence supporting the aggravator, Petitioner has failed to show a connection between the prosecutor's comments and the jury's finding of the great risk of death aggravator. Thus, Petitioner has failed to show that the OCCA's decision is unreasonable and that the prosecutor's comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly, 416 U.S. at 643.

---

[18] Petitioner's tangential argument concerning the constitutionality of Oklahoma's great risk of death aggravator is likewise rejected. The OCCA's application of the aggravator in this case does not call into question previous holdings by the Tenth Circuit that the aggravator passes constitutional muster. See Ross v. Ward, 165 F.3d 793, 800 (10th Cir. 1999); Brecheen v. Reynolds, 41 F.3d 1343, 1360 (10th Cir. 1994).

Petitioner's final attack on the great risk of death aggravator concerns the jury instructions. At Petitioner's trial, the jury was given a uniform instruction defining the aggravator as follows: "During the commission of the murder, the defendant knowingly created a great risk of death to more than one person" (O.R. VI, 1042). Offering a more expansive instruction, Petitioner claims, as he did on direct appeal, that the jury should have been told of the aggravator's proximity requirements. (Pet. at 152, <u>citing</u> <u>Snow v. State</u>, 1994 OK CR 39, ¶ 24, 876 P.2d 291, 297, for the proposition that the aggravator applies when "the defendant's acts that create the risk of death to another which are in close proximity, in terms of time, location and intent to the act of the killing itself.") In denying Petitioner relief on this claim, the OCCA first noted that at trial Petitioner neither objected to the instruction given nor offered his more expansive instruction. The OCCA then found, in accordance with its prior decisions, that the uniform instruction is "'clear,'" "'readily understandable,'" and "sufficient to fully inform the jury on the aggravator." <u>Eizember</u>, 2007 OK CR 29, ¶ 139, 164 P.3d at 241 (citations omitted).

As previously noted, <u>see</u> Section IV.C., <u>supra</u>, Petitioner must surpass a high bar in order to obtain relief for an omitted instruction, and he cannot do so here. In addition to the fact that Petitioner did not object at trial, Petitioner has not shown that the instruction given resulted in the denial of a fair trial. This is especially so given this Court's determination that the OCCA reasonably found sufficient evidence supporting the aggravator. The aggravator, as defined for the jury, is sufficiently limited and constitutionally applied. <u>See</u> <u>Cartwright v. Maynard</u>, 802 F.2d 1203, 1222 (10th Cir. 1986) ("[I]f the Oklahoma court has applied a

consistent construction to the language [of the great risk aggravator] and if the aggravating circumstance is supported by the evidence in this case, there is no constitutional infirmity."). See also Brecheen, 41 F.3d at 1357-61 (upholding constitutional challenges to Oklahoma's great risk aggravator and particularly noting that its general language gives the jury a common sense understanding of its application).

In conclusion, the Court finds that all of Petitioner's challenges to the great risk of death aggravator are unavailing. Relief on Ground IX is therefore denied.

### 2. Ground X: Especially Heinous, Atrocious, or Cruel Aggravator.

In Ground X, Petitioner challenges the sufficiency of the evidence supporting the especially heinous, atrocious, or cruel aggravator. Petitioner's particular complaint is the alleged absence of evidence that Mr. Cantrell endured conscious physical suffering prior to his death. Petitioner additionally asserts that because the OCCA found the evidence sufficient in his case, it is evident that the OCCA is applying the aggravator in an unconstitutionally overbroad manner. Petitioner asks the Court to vacate the aggravator. Respondent asserts that the OCCA's decision is neither contrary to nor an unreasonable application of Supreme Court law.

Despite Petitioner's own statements to police regarding Mr. Cantrell's fight for his life, Petitioner nevertheless argues, as he did to the OCCA on direct appeal, that the evidence is insufficient to support a finding that Mr. Cantrell experienced conscious physical suffering. In support of his claim, Petitioner points to the absence of medical testimony that Mr. Cantrell experienced pain and had defensive wounds. Petitioner additionally claims that

because two of his other elderly victims denied experiencing pain during their altercations with him, logic dictates that Mr. Cantrell must not have felt pain either. In rejecting these arguments on direct appeal, the OCCA held as follows:

> [Petitioner] told the authorities he hit Mr. Cantrell on his left side with the butt of the shotgun, causing Mr. Cantrell to fall backwards onto a table containing glass knickknacks. Mr. Cantrell got to his knees and started to get up when [Petitioner] hit him again with the butt of the shotgun. After being knocked down, Mr. Cantrell again tried to get up when [Petitioner] hit him in the back of the head with the butt of the shotgun. [Petitioner] said he continued to hit Mr. Cantrell in the back of the head until he stopped attempting to get up. [Petitioner] said Mr. Cantrell was breathing when he dragged his body into the bathroom and he heard him "kind of gagging" when [Petitioner] tried to sit him up in the bathroom.

> Dr. Ronald Distefano, the medical examiner testified he found multiple injuries to Mr. Cantrell's head, consisting of five distinct areas of lacerations and abrasions. The injuries included actual injury to Mr. Cantrell's brain surface and a skull fracture. He testified the five distinct areas were caused by an object forcefully striking the head and that it would have required a great deal of force to inflict the injuries. Dr. Distefano said any of the five injuries had the potential to result in unconsciousness and he could not specifically determine which of the five injuries occurred first. He also stated that a single blow might not necessarily cause unconsciousness and if the victim continued to respond after being struck, that would be an indication of consciousness.

> [Petitioner] argues that two other "senior citizens" were beaten in the head with a gun and testified that because of the adrenaline rush, they felt no pain. Therefore, Mr. Cantrell probably did not feel any pain. Neither Mrs. Wright nor Dr. Peebles suffered the extent of injuries inflicted upon Mr. Cantrell nor did they suffer from chronic medical conditions, as did Mr. Cantrell. Just because Mrs. Wright and Dr. Peebles testified they felt no pain as result of their injuries, does not mean Mr. Cantrell didn't feel any pain. Mr. Cantrell was a chronically ill 77-year-old man with limited mobility engaged in a fight for his life with [Petitioner]. Dr. Smith, the Cantrells' personal physician, contradicted Petitioner's account of the struggle with Mr. Cantrell as he testified Mr. Cantrell was physically unable to get to his hands and knees after falling to the floor. The repeated beatings with a shotgun endured by Mr. Cantrell and his determined resistance were sufficient to establish his

conscious physical suffering at the hands of [Petitioner]. Reviewing the evidence in the light most favorable to the State, we find a rational trier of fact could have found the facts necessary to support the aggravating circumstance of heinous, atrocious or cruel beyond a reasonable doubt.

Eizember, 2007 OK CR 29, ¶¶ 141-43, 164 P.3d at 242.

Without question, the OCCA's disposition of Petitioner's claim is a reasonable application of Jackson. The evidence clearly shows that Petitioner used the butt end of the shotgun to inflict several blows to Mr. Cantrell's head. Although Petitioner is correct that one blow may have been sufficient to render Mr. Cantrell unconscious, Petitioner himself admitted that the reason he kept striking Mr. Cantrell was because he kept trying to get up. The efforts put forth by Mr. Cantrell to resist Petitioner establish that he was conscious during the attack. It is additionally clear that the blows delivered by Petitioner would have caused anyone to experience pain and suffering, but when considering Mr. Cantrell's age and failing health, the jury's finding of conscious physical suffering is amply supported by the evidence. Petitioner's Ground X is therefore denied.[19]

_____

[19] Petitioner's tangential argument concerning the constitutionality of Oklahoma's especially heinous, atrocious, or cruel aggravator is likewise rejected. In Petitioner's case, the jury was specifically advised that this aggravator required a finding "that the murder was preceded by either torture of the victim or serious abuse of the victim. . . ." In addition, the jury was given the following explanatory definitions:

You are instructed that the term "torture" means the infliction of either great physical anguish or extreme mental cruelty. You are further instructed that you cannot find that "serious physical abuse" or "great physical anguish" occurred unless you also find that the victim experienced conscious physical suffering prior to his death.

(O.R. VI, 1043). As acknowledged in Wilson v. Sirmons, 536 F.3d 1064, 1108 (10th Cir. 2008), "[t]he Tenth Circuit has routinely upheld the constitutionality of [Oklahoma's] heinous, atrocious, or cruel aggravator so long as it includes the 'torture or serious physical abuse' limitation."

### 3. Ground XI: Balancing of Aggravating and Mitigating Circumstances.

In Ground XI, Petitioner requests the Court to vacate his death sentence because the aggravating circumstances do not outweigh the mitigating circumstances. Characterizing the OCCA's contrary finding as conclusory, Petitioner argues that the OCCA's decision is contrary to or an unreasonable application of Burger v. Kemp, 483 U.S. 776, 785 (1987), and Beck, 447 U.S. at 637-38, both of which acknowledge the exacting examination and heightened scrutiny which capital cases demand.

As previously discussed in Section IV.B., supra, Petitioner's ability to obtain federal habeas relief is contingent upon his ability to point to "Supreme Court precedent clearly establishing the legal right on which [his] claim is premised." Lambert, 594 F.3d at 1263. General legal principles, including the enhanced diligence and extra care to be afforded judicial review of death penalty cases, as claimed by Petitioner with respect to this claim, will not support the grant of habeas relief. House, 527 F.3d at 1017 n.5. In addition, the Court finds that the OCCA's treatment of Petitioner's claim was not conclusory. After addressing Petitioner's challenges to the aggravating circumstances, the OCCA also detailed the mitigation evidence presented by Petitioner at trial before denying Petitioner his requested relief. Eizember, 2007 OK CR 29, ¶¶ 123-48, 164 P.3d at 239-43. The OCCA held as follows:

> "Specific standards for balancing aggravating and mitigating circumstances are not constitutionally required." Romano v. State, 1993 OK CR 8, ¶ 111, 847 P.2d 368, 392, citing Zant v. Stephens, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983). The "beyond a reasonable doubt" burden of proof analysis is not strictly applicable to the weighing process of the

second stage. Id., 1993 OK CR 8 at ¶ 112, 847 P.2d at 392. "While the State must prove beyond a reasonable doubt the existence of at least one of the enumerated aggravating circumstances, the determination of the weight to be accorded the aggravating and mitigating circumstances is not a fact which must be proved beyond a reasonable doubt. Instead, it is a balancing process." Id. citing Johnson v. State, 1987 OK CR 8, ¶ 44, 731 P.2d 993, 1005.

We have carefully reviewed and weighed the evidence supporting the aggravating circumstances, as well as the evidence offered in mitigation. We find that under the facts of this case the evidence in aggravation outweighed the evidence in mitigation. [Petitioner] correctly asserts that the United States Supreme Court has interpreted the Eighth Amendment to the federal constitution to mean that the death penalty may only be imposed upon those few murderers who are deemed the "worst of the worst murderers", citing Cheney v. State, 1995 OK CR 72, ¶ 9, 909 P.2d 74, 78. He argues that he "is hardly the worst of the worst" and that the death penalty is not warranted in this case. To the contrary, the evidence clearly shows [Petitioner] is indeed one of the "worst of the worst" and the death penalty is appropriate in this case. This assignment of error is denied.

Id. at ¶¶ 149-50, 164 P.3d at 243 (footnote omitted). Based on the foregoing, the Court finds that Petitioner has failed to establish his entitlement to relief. Relief on Ground XI is therefore denied.

### G.    Ground XII:    Ineffective Assistance of Counsel.

In Ground XII, Petitioner claims that both his trial counsel and his appellate counsel rendered constitutionally ineffective assistance. Respondent asserts that of the four complaints lodged against trial counsel and the three complaints lodged against appellate counsel, only one portion of one trial counsel complaint is unexhausted and procedurally barred from review. As to the remaining complaints, Respondent contends that the OCCA's merit determinations are not contrary to or an unreasonable application of Strickland v. Washington, 466 U.S. 668 (1984).

58

To obtain relief under Strickland, a petitioner must show that his counsel's performance was deficient and that he was prejudiced by it. Strickland, 466 U.S. at 687. The assessment of counsel's conduct is "highly deferential," and a petitioner must overcome the strong presumption that counsel's actions constituted sound trial strategy. Id. at 689. While "[s]urmounting Strickland's high bar is never an easy task[,]" Padilla v. Kentucky, 559 U.S. 356, 371 (2010), the difficulty is intensified when a petitioner seeks habeas relief on a Strickland claim. Given the deference afforded to state court decisions by the AEDPA, the deference given to a Strickland claim is effectively doubled. Knowles v. Mirzayance, 556 U.S. 111, 123 (2009). See Pinholster, 563 U.S. at ___, 131 S.Ct. at 1403 ("We take a 'highly deferential' look at counsel's performance . . . through the 'deferential lens of § 2254(d) . . . .'") (citations omitted). Federal habeas courts have been cautioned to "guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Richter, 562 U.S. at ___, 131 S.Ct. at 788.

**1.    Trial Counsel Claims.**

Petitioner's first three claims of alleged trial counsel ineffectiveness relate to claims raised in his Grounds I, V, VI, VII, and IX. The OCCA denied relief on each of these claims based on its determination that the underlying claims were without merit. Eizember, 2007 OK CR 29, ¶¶ 153-56, 164 P.3d at 244-45. For the following reasons, the Court finds that

these determinations of the OCCA are not contrary to or an unreasonable application of Strickland.

In disposing of Petitioner's claims on the prejudice prong, the OCCA acted within the guidance given by the Supreme Court in Strickland. In Strickland, the Supreme Court expressly held that

> there is no reason for a court deciding an ineffective assistance claim to approach the inquiry in the same order [as did the Supreme Court in Strickland] or even to address both components of the inquiry if the defendant makes an insufficient showing on one. In particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. The object of an ineffectiveness claim is not to grade counsel's performance. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed.

Strickland, 466 U.S. at 697. Beyond pointing to an error or omission on the part of trial counsel, Strickland requires a showing of actual prejudice. Id. at 687. Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

Citing to its merit determinations of the underlying substantive claims, the OCCA effectively held that (1) because Juror D.B. "did not have such a strong bias towards the death penalty that the performance of her duties as juror would be prevented or substantially impaired[,]" Eizember, 2007 OK CR 29, ¶ 57, 164 P.3d at 226, trial counsel's failure to remove her with an available peremptory challenge and properly preserve the error did not deny Petitioner his right to an impartial jury, id. at ¶ 153, 164 P.3d at 244; (2) because the

error in the second degree murder by imminently dangerous conduct instruction was harmless given that the jury was instructed on another non-capital lesser offense, trial counsel's failure to object to the instruction given did not result in <u>Beck</u> error, <u>id.</u> at ¶ 154, 164 P.3d at 244; (3) because "the evidence did not warrant jury instructions on heat of passion manslaughter or assault and battery with a dangerous weapon[,] [a]ny requests by defense counsel to give such instructions would have been overruled[,]" <u>id.</u> at ¶ 155, 164 P.3d at 244; and (4) because the jury was properly instructed on the statutory requirements for the great risk of death aggravator and because the prosecutor's comments did not mislead the jury as to such requirements, "any objections by defense counsel would have been overruled." <u>Id.</u> at ¶ 156, 164 P.3d at 244-45. Petitioner has not demonstrated that these holdings by the OCCA are unreasonable. Therefore, just as this Court has denied relief on the underlying claims, the Court additionally finds that Petitioner has failed to show that the OCCA acted unreasonably in its application of <u>Strickland</u> to his corresponding claims of ineffectiveness. <u>See</u> <u>Freeman v. Attorney Gen.</u>, 536 F.3d 1225, 1233 (11th Cir. 2008) ("A lawyer cannot be deficient for failing to raise a meritless claim . . . ."); <u>Snow v. Sirmons</u>, 474 F.3d 693, 724-25 (10th Cir. 2007) (trial counsel was not ineffective for failing to object to certain evidence which the OCCA found admissible); <u>Spears</u>, 343 F.3d at 1249 (trial counsel was not ineffective for failing to object to the giving of a flight instruction where the OCCA found that sufficient evidence supported the giving of the instruction).

Petitioner's final complaint against his trial counsel is the failure to utilize certain evidence which appellate counsel found in trial counsel's file and presented to the OCCA in a Rule 3.11 motion. The OCCA described the evidence as follows:

> color photographs showing a small round healing wound to [Petitioner's] thumb, a small round healing wound in the middle of the back of the wrist, a slight scrape or healing wound between the middle and lower joints of the index finger, and a similar wound between the same two joints of the right middle finger.

Eizember, 2007 OK CR 29, ¶ 164, 164 P.3d at 246. Related to his assertion that the jury should have been instructed on heat of passion manslaughter as a lesser-included offense, Petitioner claimed on direct appeal that trial counsel should have used this evidence to "corroborate[] his statements that he was provoked by Mr. Cantrell's actions in grabbing the shotgun, accidentally shooting Mrs. Cantrell in the back and [Petitioner] in the right hand, and that before his anger had time to cool, [Petitioner] beat Mr. Cantrell with the shotgun." Id. at ¶ 160, 164 P.3d at 245. Reviewing Petitioner's claim in the Rule 3.11 context, the OCCA held as follows:

> Setting aside questions we may have concerning the actual cause of [Petitioner's] injuries, the evidence in this case, including [Petitioner's] own statements, shows he was a burglar and home invader in the Cantrell residence. [FN30] Under 21 O.S.2001, § 1289.25(B), Mr. Cantrell was justified in using any degree of physical force, including but not limited to deadly force, against [Petitioner] who had made an unlawful entry into his home. See also State v. Anderson, 1998 OK CR 67, ¶ 10, 972 P.2d 32, 36 (interpreting language of § 1289.25). Any force Mr. Cantrell may have used against [Petitioner] was justified. "It would be ludicrous to consider the victim's justified actions as provocation for the appellant's illegal act". Westley v. State, 754 S.W.2d 224, 230 (Tx.Cr.App.1988).

> [FN30] Based upon the evidence in this case, [Petitioner] could
> have received his injuries through his struggle with Dr. Peebles.
> Additionally, the medical examiner testified that Mrs. Cantrell
> was shot at a relatively close range, approximately five to eight
> feet and that several of the birdshot pellets remained in her
> body. It is questionable whether the injuries reflected in the
> photographs submitted by [Petitioner] could have been caused
> by birdshot pellets fired at close range.
>
> Therefore, trial counsel's failure to use the photographs (whether
> intentional or not) does not convince us by clear and convincing evidence there
> is a strong possibility that defense counsel was ineffective for failing to utilize
> the evidence at trial. [FN31] Accordingly, we decline to grant [Petitioner's]
> application for an evidentiary hearing.
>
> > [FN31] As the photographs were found in the trial folder, it is
> > not clear from the record or [Petitioner's] motion whether trial
> > counsel intentionally did not use the photographs as a matter of
> > trial strategy or whether the photographs were merely
> > overlooked.

Id. at ¶¶ 165-66, 164 P.3d at 246.

In his Petition, Petitioner reasserts his Rule 3.11 claim, but adds a related claim that this same evidence should have been used by his trial counsel in the second stage as mitigation evidence. Respondent correctly asserts that this added claim is unexhausted and procedurally barred.[20] Lott, 705 F.3d at 1179. As to the Rule 3.11 claim, the Court notes that the parties differ on the standard of review this Court should apply to it; however, the Tenth Circuit's recent holding in Lott makes it clear that AEDPA deference applies. Id. at 1211-13. Applying AEDPA deference, the Court finds that Petitioner has failed to show that the

---

[20] The Court additionally notes that the added claim fails on the merits as well, as Petitioner's scant argument falls short of satisfying the Strickland standard. (Pet. at 179-80.)

OCCA's decision is contrary to or an unreasonable application of <u>Strickland</u>.[21]  Even if Petitioner could have proven that the wounds on his hands were the result of being shot at by Mr. Cantrell, his argument for a heat of passion manslaughter instruction would not have proven successful because Mr. Cantrell did not act improperly in attempting to protect himself and his wife from Petitioner's unlawful intrusion.  <u>See</u> Ground VI, <u>supra</u>.

## 2. Appellate Counsel Claims.

Petitioner raises three claims regarding his appellate counsel's representation.  All of these claims were presented to and denied by the OCCA on post-conviction.  <u>Eizember</u>, No. PCD-2005-371, slip op. at 3-9.  Respondent asserts that Petitioner is not entitled to relief on any of the claims because he has failed to meet the AEDPA standard for relief.

Claims regarding the effectiveness of appellate counsel are governed by <u>Strickland</u> as well.  <u>Cargle v. Mullin</u>, 317 F.3d 1196, 1202 (10th Cir. 2003).  In accordance with <u>Strickland</u>, a petitioner alleging appellate counsel ineffectiveness must show (1) that his appellate counsel's actions on appeal were objectively unreasonable and (2) that, but for counsel's unreasonable actions, he would have prevailed on appeal.  <u>Smith v. Robbins</u>, 528 U.S. 259, 285-86 (2000); <u>Miller v. Mullin</u>, 354 F.3d 1288, 1297 (10th Cir. 2004). When counsel has filed a brief on the merits, it is difficult to show his incompetence for failing to raise a particular claim.  <u>Robbins</u>, 528 U.S. at 288.  Appellate counsel does not have an obligation to raise every possible claim irrespective of its merit. In fact, "the hallmark of effective appellate advocacy" is the "process of 'winnowing out weaker arguments on appeal

_____

[21] Even under de novo review, the Court would find Petitioner's claim unmeritorious.

and focusing on' those more likely to prevail." <u>Smith v. Murray</u>, 477 U.S. 527, 536 (1986) (quoting <u>Jones v. Barnes</u>, 463 U.S. 745, 751-52 (1983)). "This has assumed a greater importance in an era when oral argument is strictly limited in most courts–often to as little as 15 minutes–and when page limits on briefs are widely imposed." <u>Barnes</u>, 463 U.S. at 752-53.

In order to evaluate appellate counsel's actions, the omitted issues must be examined. With respect to the omitted issue, the Tenth Circuit has provided the following guidance:

> If the omitted issue is so plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish deficient performance; if the omitted issue has merit but is not so compelling, the case for deficient performance is more complicated, requiring an assessment of the issue relative to the rest of the appeal, and deferential consideration must be given to any professional judgment involved in its omission; of course, if the issue is meritless, its omission will not constitute deficient performance.

<u>Cargle</u>, 317 F.3d at 1202.

Petitioner's first complaint is appellate counsel's failure to raise a claim of trial counsel ineffectiveness. Although appellate counsel presented multiple challenges to trial counsel's representation on direct appeal, as discussed above, Petitioner asserts that appellate counsel should have additionally argued that trial counsel was ineffective for failing challenge the admission of his second confession. Asserting that the second confession was obtained after his unequivocal assertion of his right to remain silent, Petitioner asserts that it should have been suppressed pursuant to <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966), and <u>Michigan v. Mosley</u>, 423 U.S. 96 (1975). Despite the fact that the confession was his second

admission of guilt, Petitioner nevertheless asserts that he was prejudiced by its admission because it contained more admissions of fact than his first confession. Petitioner contends that appellate counsel was ineffective for omitting this "clearly meritorious issue." (Reply at 26.)

In denying Petitioner relief on this claim, the OCCA first noted that trial counsel did in fact file a motion to suppress Petitioner's confession, that a hearing on the motion was held, and that the trial court denied the motion. The OCCA then stated as follows:

> The mere failure to raise an issue on appeal, whether meritorious or not, is not grounds for a finding of ineffectiveness. See Mitchell v. State, 1997 OK CR 9, ¶ 6, 934 P.2d 346, 350 (failure to raise "arguably meritorious claim" does not, in itself, constitute deficient performance[]); Hooks v. State, 1995 OK CR 56, ¶ 6, 902 P.2d 1120, 1124 (failure to raise an issue on appeal that has no merit is not ineffective assistance of counsel).

Eizember, No. PCD-2005-371, slip op. at 7-8. Thereafter, the OCCA concluded:

> Appellate counsel filed a well written, thoroughly researched brief raising eighteen [sic] assignments of error. Appellate counsel appropriately sorted through potential claims of error and raised only those with the best chances for relief. That appellate counsel did not prevail on gaining relief for Petitioner is not a sign of ineffectiveness. We find appellate counsel's failure to challenge the voluntariness of the confession . . . did not render his performance unreasonable under prevailing professional norms. Petitioner has not shown that appellate counsel's judgment was unreasonable under the circumstances or did not fall within the wide range of professional assistance owed to a client by an attorney. Therefore, as Petitioner has not established that appellate counsel's performance was deficient, his claim of ineffective assistance of appellate counsel has no merit . . . .

Id. at 8-9 (citation omitted). As noted above, within its discussion of this claim of appellate counsel ineffectiveness, the OCCA employed language which the Tenth Circuit has considered a deviation from the Strickland standard. Specifically, in McGee v. Higgins, 568

F.3d 832, 838-39 (10th Cir. 2009), the Tenth Circuit found that no deference was due an OCCA ineffectiveness determination when it included within its <u>Strickland</u> analysis a statement to the effect that the merit of the omitted issue was irrelevant to a finding of ineffectiveness. In <u>McGee</u>, the Tenth Circuit found that de novo review was appropriate, even if, as in this case,[22] "the OCCA's order denying post-conviction relief does not specifically state that the OCCA relied on the repudiated 'regardless of merit' standard" to deny the petitioner relief. <u>Id.</u> at 839. However, even applying de novo review, the Court finds that Petitioner is not entitled to relief on this claim.

Trial counsel did file a motion to suppress both of Petitioner's confessions. Trial counsel argued that Petitioner's first confession, given in the hospital where he was being treated for gunshot wounds, should be suppressed because, given his medical condition, Petitioner was unable to effectuate a knowing and voluntary waiver of his <u>Miranda</u> rights. Trial counsel argued that the second confession should be suppressed because it was tainted by the first illegally obtained one (O.R. I, 132-41). At the conclusion of a hearing held on the motion, the trial court overruled the motion to suppress (Tr. 11/23/04, 106-10). The trial court made detailed findings of fact regarding both confessions, including the following about the second one:

> At the time of making the statement to . . . Ed Willingham on December 3, 2003, the defendant was again properly informed of his Miranda rights. This

---

[22] In addressing Petitioner's appellate counsel claims, the OCCA acknowledged the application of <u>Strickland</u> and set forth the appropriate standard of review. <u>Eizember</u>, No. PCD-2005-371, slip op. at 3-4. In addition, the OCCA's conclusion, quoted above, is otherwise consistent with <u>Strickland</u>.

was an entirely separate occasion from his previous statements to the F.B.I. officer and to the sheriff's deputy. He again was not tricked or induced into making a statement. He was in full possession of his mental abilities, made a free and informed decision to talk at that time.

(Tr. 11/23/04, 109). Thereafter, the trial court concluded:

that the waiver of the Miranda warnings made by defendant were voluntary and were the products of a free and deliberate choice made by the defendant and were not the object of intimidation or coercion. This defendant seems to be strong-willed and an extremely intelligent person and that was the condition at the time of giving these statements. Defendant waived his Miranda rights with a full awareness both of the nature of the rights being abandoned and as to, as to the consequences of abandoning them and while the State bears a heavy burden in this area the Court finds beyond a reasonable doubt that considering the totality of the circumstances the evidence shows an uncoerced choice in the requisite level of voluntariness that has been recited.

As to the sheer voluntariness of the statement the State has demonstrated by the same standard that the confession was voluntary, was a product of an essentially free and unconstrained choice by its maker. For these reasons and others that are apparent from the examination of the evidence offered today the Motion to Suppress is overruled. . . .

(Tr. 11/23/04, 109-10). At trial, both of Petitioner's confessions were admitted over trial counsel's continuing objection (Tr. IV, 776, 829-30; Tr. VIII, 1554; State's Exhibits 1 and 81).

Despite (1) the actions trial counsel took to suppress Petitioner's confessions; (2) the findings of fact made by the trial court concerning his second confession; and (3) the admission of his first confession (which Petitioner does not challenge), Petitioner nevertheless asserts that his trial counsel should have sought suppression of his second confession on a different legal ground and that he would have prevailed on appeal if his

appellate counsel would have raised this particular trial counsel ineffectiveness claim. For these very reasons, however, Petitioner's claim fails.

First, Petitioner has not shown that his appellate counsel acted unreasonably. Robbins, 528 U.S. at 285. Contrary to Petitioner's contention, the omitted issue here is not plainly meritorious. Of course, it is not clearly meritless either. Under these circumstances, Petitioner has to overcome the "deferential consideration" given to appellate counsel in the determination of claims to be raised on appeal. Cargle, 317 F.3d at 1202. This he cannot do. As Respondent points out, appellate counsel presented thirteen propositions of error, using all of the 100 pages allowed by OCCA rule. Petitioner has not shown what claim(s) appellate counsel should have exchanged for the one he asserts should have been raised. Moreover, it is safe to assume that Petitioner believes that all of the claims raised on direct appeal have at least some merit because, again as Respondent points out, he has raised them all again to this Court in support of his claim for habeas relief. Second, Petitioner has not shown that he would have prevailed on appeal if the omitted issue had been raised. Again, while the omitted issue is not completely without merit, neither is it clearly meritorious. Having reviewed Petitioner's videotaped confession, as well as the findings of fact made by the trial court concerning the voluntariness of both confessions, and given the admission of Petitioner's first confession which has more than sufficient detail to support the jury's verdicts in both stages, the Court finds that Petitioner has not shown that he was prejudiced by the omission of the claim, i.e., that the OCCA would have granted him relief had it been included.

In his second complaint, Petitioner faults appellate counsel for not investigating, developing, and presenting evidence showing that he was denied an impartial jury. This complaint focuses on two jurors, J.S. and M.B., whom Petitioner asserts committed perjury during voir dire. In denying Petitioner relief on this claim, the OCCA applied <u>McDonough Power Equipment, Inc., v. Greenwood</u>, 464 U.S. 548, 556 (1984), wherein the Supreme Court held that in order to obtain a new trial on this ground "a party must first demonstrate that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." <u>Eizember</u>, No. PCD-2005-371, slip op. at 4. The OCCA thoroughly analyzed the issue as follows:

> In the present case, Petitioner asserts that in response to the question on the written questionnaire, "[w]hat work do you do?", juror J.S. responded, "IRS Appeals Officer". When asked about his previous employment, the juror responded, "[r]etail work/Walmart/Sears". Petitioner contends this was not a truthful answer as post-conviction counsel discovered evidence showing that prior to Petitioner's trial, J.S. served as an "Internal Revenue Officer". Petitioner argues that through research on the Internal Revenue Service website, J.S. served in a law enforcement position and therefore would have been subject to a challenge for cause.

> The law requires truthful answers to *voir dire* questioning. <u>Hard v. Burlington Northern Railroad Co.</u>, 870 F.2d 1454, 1459 (9th Cir. 1989). An untruthful response could indicate an attempt to conceal bias, which would provide the basis for a challenge for cause. <u>Id.</u> Such is not the case here. J.S.'s responses indicate that he interpreted the question as asking for his employment at the time of trial, to which he responded the "IRS", and for his employment preceding that by the "IRS", to which he replied retail sales. This is a reasonable interpretation of the question, and the juror's responses do not indicate any intention to hide the truth. Petitioner's attempts to find an untruthful answer in the juror's response of "IRS Appeals Officer" instead of "Internal Revenue Officer" is to no avail, as in both cases the employer would

70

seem to be the Internal Revenue Service (IRS). Petitioner has failed to show that juror J.S. failed to answer honestly a material question on *voir dire*, and therefore he had [sic] not met the first part of the <u>McDonough</u> test.

Other than reference to the Internal Revenue Service website, Petitioner provides no support for his claim that by working for the IRS, J.S. served in a law enforcement position. This oblique reference is insufficient to support such a claim. Further, the defense did challenge J.S. for cause at trial on the basis that his answers on *voir dire* showed he had views regarding punishment that would prevent or substantially impair the performance of his duty as a juror in accordance with his instructions and oath as a juror. In denying the challenge for cause, the trial court was well aware of the juror's employment and such did not form a valid basis for excusing him for cause. Thus the second prong of <u>McDonough</u> has not been satisfied.

Petitioner also asserts that on the written questionnaire, when asked if he had ever sued anyone or been sued by anyone, juror M.B. responded, "[y]es. Family lawsuit for my daughter's auto accident in 1990". Petitioner asserts that through investigation post-conviction counsel discovered that M.B. was a defendant in <u>Miles Financial Services, Inc., v Bounds, et al.</u>, in the District Court of Canadian County, Case No. CJ-1994-105, and that M.B. and his wife filed bankruptcy in the Western District of Oklahoma in 1986.

It is impossible for us to determine on the record before us whether M.B.'s failure to list these other lawsuits on the written questionnaire was intentional or not. However, even if M.B. had included the information of his past involvement in civil proceedings, such would not have provided a valid basis for a challenge for cause in this criminal matter. "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." <u>McDonough</u>, 464 U.S. at 556, 104 S. Ct. at 850. We find nothing on the record to support a finding that M.B.'s failure to respond affected his impartiality as a juror.

As Petitioner has failed to show that either J.S. or M.B. honestly failed to answer a material question on *voir dire*, or that the omitted information would have provided the valid basis for a challenge for cause, he has failed to demonstrate a reasonable probability that but for appellate counsel's failure to investigate and raise the issue on appeal, the outcome of the appeal

> proceedings would have been different. Therefore, we find Petitioner was not
> denied the effective assistance of appellate counsel.

Id. at 4-7. Petitioner has not shown that the OCCA's analysis of this issue is contrary to or

an unreasonable application of Strickland or McDonough.

Petitioner's final challenge to his appellate counsel's representation is equally

unavailing. Here, Petitioner alleges that his appellate counsel was ineffective for failing to

raise a claim challenging the constitutionality of Oklahoma's capital murder procedure.

Petitioner's particular complaint is that Oklahoma's procedure is structurally defective

because it does not subject the aggravators to a probable cause determination before a

magistrate at a preliminary hearing. Petitioner relies upon the Supreme Court's holdings in

Jones v. United States, 526 U.S. 227 (1999), Apprendi v. New Jersey, 530 U.S. 466 (2000),

Ring v. Arizona, 536 U.S. 584 (2002), and Blakely v. Washington, 542 U.S. 296 (2004), to

support his claim.

Citing its prior decision on the underlying issue, Primeaux v. State, 2004 OK CR 16,

88 P.3d 893, the OCCA found that Petitioner had not presented any legal authority to

effectively challenge its prior decision. In Primeaux, the OCCA rejected the very issue

raised by Petitioner with the following analysis:

> The decision in Ring is not as broad as Primeaux argues. The appellant
> in Ring did not specifically raise a claim that the indictment was
> constitutionally infirm. Ring, 122 S.Ct. at 2437 n. 4. Ring does not change the
> procedure in Oklahoma. Notice of the aggravating circumstances was
> provided in the bill of particulars. This document gives notice that the State
> intends to seek the penalty of death. The aggravating circumstances were
> presented to the jury and the jury was required to find that the aggravating

> circumstances existed beyond a reasonable doubt. This is all that is required
> by law. Johnson v. State, 1982 OK CR 37, ¶ 10, 665 P.2d 815, 819.

Primeaux, 2004 OK CR 16, ¶ 16, 88 P.3d at 899-900. Thus, given its decision in Primeaux, the OCCA found that appellate counsel was not ineffective for failing to raise the claim. Eizember, No. PCD-2005-371, slip op. at 8.

Petitioner has not shown that the decision of the OCCA on this claim is contrary to or an unreasonable application of the Supreme Court cases he cites. In Jones, the Supreme Court interpreted the federal carjacking statute as setting forth three separate offenses, "each of which must be charged by indictment, proven beyond a reasonable doubt, and submitted to a jury for its verdict." Jones, 526 U.S. at 252. In Apprendi, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." Apprendi, 530 U.S. at 490. In Ring, the Court applied Apprendi to capital defendants. "Capital defendants, no less than noncapital defendants, . . . are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." Ring, 536 U.S. at 589. In Blakely, a trial court imposed a sentence three years beyond the maximum sentence authorized by law based on facts not contained in the defendant's plea or found by a jury. Because the facts increasing the defendant's sentence were found by the trial judge alone, the Supreme Court relied upon Apprendi to find that a defendant's right to trial by jury had been violated. Blakely, 542 U.S. at 298-305, 313-14. It is clear that none of these cases require that Petitioner receive a probable cause

determination on the aggravating circumstances alleged by the State. Because the aggravating circumstances were submitted to a jury, which found two of the four aggravating circumstances alleged by the State (O.R. VI, 1059), Petitioner's death sentence was not unconstitutionally enhanced and he was not denied his right to trial by jury. Thus, the OCCA was correct in finding that appellate counsel was not ineffective for failing to raise a meritless claim.

### 3. Conclusion.

For the reasons set forth above, the Court finds that Petitioner's allegations of ineffectiveness against both his trial and appellate counsel do not warrant habeas relief. Accordingly, Petitioner's Ground XII is denied.

### H. Ground XIII: Cumulative Error.

In his final ground, Petitioner asserts that he is entitled to relief upon a claim of cumulative error. Petitioner unsuccessfully raised a cumulative error claim to the OCCA on both direct appeal and post-conviction. Eizember, No. PCD-2005-371, slip op. at 9-10; Eizember, 2007 OK CR 29, ¶ 158, 164 P.3d at 245. Respondent's initial contention is that the absence of Supreme Court authority on the viability of a claim of cumulative error prevents relief. However, Respondent additionally asserts that Petitioner's claim must be denied because the OCCA reasonably denied relief.

Without addressing Respondent's initial contention, the Court finds that Petitioner's claim fails at the onset. In two of Petitioner's thirteen claims, Grounds IV and V, the OCCA determined that error had occurred, but that, in both instances, the error was harmless. One

claim, the failure to instruct on Oklahoma's 85% rule, is a state law claim. Because cumulative error analysis in the federal habeas context is concerned with constitutional errors only, Petitioner's Ground IV cannot be included in the analysis. Alverson v. Workman, 595 F.3d 1142, 1162 (10th Cir. 2010). Given that this Court has not found any additional errors, and because cumulative error by its very nature requires more than one error to accumulate, Petitioner's cumulative error claim is simply without merit. Hooks v. Workman, 689 F.3d 1148, 1195 (10th Cir. 2012). Accordingly, Ground XIII is denied.

## V. Evidentiary Hearing.

Petitioner has requested an evidentiary hearing on all of his claims of ineffective assistance of trial and appellate counsel alleged in his Ground XII. In addition, Petitioner has made a broad request for "a hearing on another other issues, substantive or procedural, which involve facts not apparent from the existing record, and on any issues which involve facts disputed by the Respondent." (Mot. for Evidentiary Hr'g at 5-6, 7.)

"The purpose of an evidentiary hearing is to resolve conflicting evidence." Anderson v. Attorney Gen. of Kan., 425 F.3d 853, 860 (10th Cir. 2005). If there is no conflict, or if the claim can be resolved on the record before the Court, then an evidentiary hearing is unnecessary. Id. at 859. Such is the case here.

With respect to his ineffectiveness claims, Petitioner asserts that if he were granted an evidentiary hearing, he would present his trial and appellate counsel for the sole purpose of showing that their actions (or inactions) were not the result of trial strategy. The Court finds that such testimony would have no effect on the determination of Petitioner's claims,

and is therefore unnecessary.  Regarding Petitioner's "cover-all" request for a hearing on any other issues, the Court finds that the request is too broad and unsupported and the same is denied for these reasons.

## VI.  Conclusion.

After a thorough review of the entire state court record, the pleadings filed herein, and the applicable law, the Court finds that Petitioner is not entitled to his requested relief. Accordingly, Petitioner's Petition (Dkt. No. 24) and motion for an evidentiary hearing (Dkt. No. 34) are hereby **DENIED**.  A judgment will enter accordingly.

IT IS SO ORDERED this 18th day of December, 2013.


ROBIN J. CAUTHRON
United States District Judge